Containing Cases of the October Term, 1923 and January Term, 1924.

## WILLIAM PENROSE vs. GEORGE W. PAGE, Receiver
### of the Lafayette Bank.

*Claim Against Receiver—Services Rendered Bank—Evidence—Value—Reversal and Remand.*

One who was expressly employed by the directors of a bank as its "special counsel" without any agreement as to compensation except that, if they could not agree thereon after rendition of services by him, the matter should be settled by arbitration, and who, as such counsel, besides rendering various legal services, obtained numerous loans to the bank, which he personally guaranteed, *held* to be entitled to fair and reasonable compensation for his services.                           p. 11

A creditor may file his claim at any time before the distribution of a fund in court, and the failure to file a claim in receivership proceedings until after the payment of two dividends to creditors, and the claimant's failure previously to mention the claim to the receiver, are not ground for disallowing the claim, it being otherwise sufficiently proved.                     p. 11

The rule that a corporate officer or director cannot recover for services rendered in the line of his duty, unless he can show an express contract, does not preclude the allowance of a claim by one not an officer or director, for services rendered under a contract of employment as special counsel.          pp. 11, 12

That one was an officer of another corporation interested as stockholder in a bank did not deprive him of the right to accept employment by the bank as special counsel, nor justify the inference, even in the absence of express employment, that the rendition of services by him to the bank was without any intention on his part to charge therefor, or expectation by the bank of paying for the services.                          p. 12

That one claiming compensation for services rendered a bank was guarantor of a mortgage loan by the bank did not warrant the inference that in serving the bank he was serving his own interest; since his obligation under the guaranty could not be affected by the success or failure of the bank.          p. 12

The value of services rendered in procuring loans for a bank *held* not sufficiently proved, for the purpose of a claim against the receiver of the bank for compensation for such services, by the opinions of bankers as to such value, not based upon familiarity with the charges usually made or paid for such services, without any statement by the plaintiff as to the usual charge for such services.                    p. 13

It appearing, in connection with a claim against the receiver of a bank for services rendered it, that the value of such services was susceptible of satisfactory proof, but that such proof had not been furnished, and the lower court not having passed on their value, *held* that, on reversing a decree dismissing the claim, the case should be remanded, with directions to allow the claimant for his services upon the production of satisfactory evidence of their value.                    p. 13

*Decided February 1st, 1924.*

Appeal from the Circuit Court of Baltimore City (CARROLL T. BOND, J.).

Petition and claim by William Penrose against the undistributed assets of the Lafayette Bank in the hands of George W. Page, as receiver of said bank. From a decree dismissing said petition and claim, the petitioner appeals. Reversed.

The cause was argued, together with that next following, before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Edwin T. Dickerson* and *Lindsay C. Spencer,* for the appellant.

*Samuel J. Fisher,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

On April 9th, 1923, William Penrose, Esq., the appellant, filed in the Circuit Court of Baltimore City, in the case of the *State of Maryland* v. *Lafayette Bank,* his "petition and claim," in which he alleged that the Lafayette Bank was a corporation organized under the State banking laws, and "that its affairs were placed in the hands of the State Bank Commissioner as receiver on the 28th of November, 1921"; that about the 1st of October, 1921, prior to the appointment of the receiver, the board of directors of said bank passed a resolution by which the petitioner was appointed "special counsel" of said bank, and that from the time of his appointment until the bank was closed by the State Bank Commissioner he devoted his entire time to the affairs of the bank, "which was then in a critical condition"; that during said period he collected overdrafts to the amount of about $13,000, sold stocks and bonds belonging to the bank for the purpose of meeting demands of depositors, borrowed large sums of money for the bank, was in daily consultation with the board of directors, which required his services "until late at night," and provided several plans for the liquidation of the bank and the settlement of its obligations, which would have averted the failure of the bank if he had not been prevented from carrying out the same. The prayer of the petition was that the receiver be directed to hold out of the undistributed assets of the bank sufficient funds to satisfy the claim of the petitioner, and for general relief. The receiver of the bank answered the petition, admitting the incorporation of the bank and the appointment of a receiver, and stating that he was without knowledge of the other matters alleged.

At the hearing of the petition counsel for the petitioner and the receiver entered into the following agreement:

> "It is stipulated that either side may refer to any testimony or proceedings in the case of Page, Receiver, vs. Penrose (Baltimore City Court), and the Court of Appeals in deciding this case may consider any such

testimony or proceedings to the same extent as if it were fully incorporated in this record, and that the Court of Appeals has decided that the Montrose Building Association, of which William Penrose was, at the time of the rendition of the services, vice-president and a director, owned at that time one-half of the capital stock of the Lafayette Bank, and at the time of the filing of the claim for said services two dividends of twenty-five per cent. each, had been paid by the receiver to the general creditors of the Lafayette Bank."

The plaintiff then offered in evidence the following resolution of the board of directors of the Lafayette Bank, passed at a special meeting on October 14th, 1921: "On motion, Mr. Drayer, seconded by Mr. Wilson, Mr. William Penrose was appointed special counsel for the bank, and authorized on behalf of the bank to borrow from time to time such sum or sums as may be needed," and testified that he had been a member of the Bar of Baltimore City for over thirty years; that he had been a director and counsel for the Canton National Bank, had been an active director of the Union Trust Company for eight or ten years, and had been "called in" by the Bank of Laurel when it was in difficulties; that prior to the resolution mentioned he was neither a director, stockholder or an officer of the Lafayette Bank, and that the only service he had rendered the bank was the securing of a loan of $40,000 from the National Bank of Baltimore, which was "needed in a great hurry," and which he had to guarantee; that after the passage of said resolution he put in all of his time during the day and a part of the night in work for the bank; that he collected about $13,000 of unsecured overdrafts, borrowed in all $97,000 for the bank from the National Bank of Baltimore, and became personally responsible for it; that the only agreement between him and the Lafayette Bank was the resolution referred to; that the directors of the bank asked him at the time what his fee would be for his services, and that he told them that he could not tell because he did not know "what the work would be, and that if

they could not agree they would leave it to arbitration"; that
after the passage of the resolution he was in almost daily
consultation with the directors and officers of the bank, and
gave them the best legal and banking advice he could, and
advised several plans of liquidation and reorganization, and
that if the directors had pulled together there would have
been no receivership; that for securing the loan of $40,000
from the First National Bank of Baltimore, for which he
became personally responsible, and which was procured prior
to the resolution employing him as special counsel, he re-
ceived $1,600, $200 of which he paid to Mr. Haydon; that
he borrowed for the bank from the Equitable Trust Com-
pany, from October 19th to November 18th, 1921, various
sums aggregating $92,000, for which service he received "no
compensation whatever," and that he also obtained a loan of
about $50,000 from the Maryland Title Company; that from
his experience with various banking institutions, and from
what he had been told by bankers and lawyers, he was able
to state that the fair value of the services rendered by him to
the bank as special counsel was $20,000. On cross-examina-
tion the plaintiff testified that the services for which he was
claiming compensation were rendered between the 15th of
October and the latter part of November, 1921; that he had
never sent the bank a bill for his services, and had not filed
a claim for same in the receivership case prior to filing his
petition in this case; that he had testified before JUDGE BOND
"in the *Montrose* case six months previous," and that in his
testimony in that case he said that he was called in in Sep-
tember, 1921, and that the bank's affairs were in a critical
condition, although he could not find out how badly off they
were," and that in reference to the charge contained in the
answer in that case that he and his partner had figured in a
number of transactions with the bank in which the bank had
been induced to loan large sums of money on inadequate
security and lost money, and in which they were compen-
sated by their clients, he said that he had never asked for a
loan from the bank, never induced any one to, and never

profited to the extent of one penny in any transaction with the bank, except in one instance where he borrowed $40,000 for the bank and was paid a fee.

The plaintif further testified on cross-examination that he did not state in the *Montrose* case that he had a claim against the bank for $20,000, that his connection with the bank was not gone into in that case, that he was not asked what his charge was for the work he had done for the bank, and that there was no occasion at that time to mention his claim against the bank; that the reason he mentioned the compensation paid him for securing the loan of $40,000 was because that was the only thing for which he had received any compensation, and he had not profited in any way by loans made by the bank; that very few of the overdrafts, amounting to $13,000, were secured, and that it was hard work to collect them; that he was not asked to collect them, but that he did it because he felt it was his duty to do so as special counsel. On re-direct examination he stated that he had no claim in the *Montrose Building Association* case, but was simply summoned as a witness by both sides; that he was not asked in that case by either side anything about his personal claim, but thinks that Mr. Page asked him, some time after the appointment of the receiver, what his "status with the bank was," and that he told Mr. Page that "he was employed by the board of directors."

Mr. Dolfield, president of the Canton National Bank, testified that there was no precedent in Baltimore "with regard to reasonable compensation for securing loans under the circumstances detailed by the plaintiff," but that he was able to place a value on the services of the plaintiff, and, over the objection of the defendant, stated that in his opinion it was "at least $20,000," and that "the fee of $20,000 would cover all his services." Mr. Jeffery, president of the Equitable Trust Company, who stated that the loans of his company of $92,000 to the Lafayette Bank came under his supervision, testified that his company would not have made the loans but for the solicitations of the plaintiff; that the plaintiff had "a

very difficult proposition to perform," and in his opinion "$10,000 would be ample compensation" for his services. On cross-examination he stated "that he had no precedent for the valuation of the services, it was just an impression without being able to give all the reasons." Mr. Alexander, vice-president of the Equitable Trust Company, after being told the services rendered by the plaintiff, testified that in his opinion $10,000 would be "a fair fee" for such services. On cross-examination he testified that he was viewing the matter as a whole proposition; that his bank would not have made the loans "except they felt that somebody that was different from that crowd was guaranteeing it," and that if he "tried to appraise the services in securing the loans it would be a minimum of $5,000, or as high as $10,000, but that he could not get his mind away from the whole atmosphere of the thing." Mr. Addison, one of the directors of the Lafayette Bank, testified that between the 14th of October and the time of the receivership "there was not any disapproval at any board meeting of Mr. Penrose's handling of the bank's affairs; that he was present at the meeting when plans devised by Mr. Penrose for saving the bank were presented, and they were under the impression Mr. Penrose could save the bank." Mr. Ganster, a member of the bar, who was formerly in the office of the plaintiff, testified that between October 14th and November 28th the plaintiff devoted practically all of his time to the Lafayette Bank; that he was borrowing money from the National Bank of Baltimore and the Equitable Trust Company; that the plaintiff guaranteed the loan by the Lafayette Bank of $27,000 on the South Charles Street property with him, and that the plaintiff did it at his request, and the bank loaned the money on the strength of the plaintiff's "guarantee"; that he had been after the plaintiff "for the past year" to file his claim against the bank for his services, and that they had talked it over on many occasions in the office, but that the plaintiff takes care of everybody but himself and put it off; that the plaintiff had determined on $20,000 as the value of his services and had

his claim typewritten before he was sued, and that he told the plaintiff that he should have made his claim larger. Mr. Thomas, president of the National Bank of Baltimore, upon being "told what services had been rendered by" the plaintiff to the Lafayette Bank as special counsel, testified that, with the plaintiff's "guarantee of the paper and the amount of work he put on the matter" $30,000 would be a reasonable fee, and that without his personal guarantee the fair value of the services would have been from $15,000 to $20,000.

Mr. Page, the receiver, when called as a witness for the defendant, testified that he had been State Bank Commissioner for four years and deputy "for six years prior to that," and that he took charge of the bank on the 25th of November; that he found on the books of the bank the loan of $40,000 from the National Bank of Baltimore, and that $1,600 had been paid as a commission for securing the loan, and that when he asked the plaintiff about it, he said "he had gotten $400 of it and felt he was entitled to it as one per cent. of the amount of the loan," which he thought was a fair charge to make; that the plaintiff also told him that Mr. Haydon felt that he ought to get something out of it, and that he had divided the $400 with Mr. Haydon; that he, witness, had seen the plaintiff "about a great many matters that involved the" bank "and his connection with it, but that" the plaintiff "never made any mention of any amount due him for services; * * * that the benefit received by the bank, assuming that the plaintiff negotiated these loans, was that the bank needed the money at that time; * * * that all the plaintiff was doing was taking the collateral down to the Equitable Trust Company and the National Bank of Baltimore and borrowing money from time to time to tide the bank over from day to day; that this seemed what the plaintiff was doing most of the time, but that he did have in mind turning the bank over to another institution and discussed that matter with the witness a number of times." When asked what in his opinion "would be a fair and reasonable compensation" for the services "testified to by him," he said, over the

objection of the plaintiff, that he knew the plaintiff did devote some of his time to the bank during the period of six weeks, and "that it may be that he is entitled to compensation for it, but supposes that the $1,600 he got would be at the rate of $12,000 a year," and he thought that was "pretty fair compensation for the work he did for the time he had been in it," and that the plaintiff "would be entitled to $1,890 for borrowing the loans, and he thought this was fair"; that the plaintiff told him that he had been asked to be vice-president or counsel of the bank, but that the bank was not in a position to pay him any salary, and he felt he could not give his services or a part of his services without compensation; that he thought he ought to have $8,000 or $9,000." On cross-examination the witness testified that the plaintiff discussed with him the methods of saving the bank, and that they were feasible; that about the first of November he, witness, told the directors "there was still time to save the bank, but that they could not be made to act"; that he knew that the plaintiff was rendering services right along; "knew he was retained there and seemed to be devoting a good deal of his time to the bank," but that he never said anything to witness "as to whether he was rendering the services gratis"; that he did not know the extent of the services rendered by the plaintiff, and does not know whether it was hard to borrow money at that time; that if the plaintiff assumed liability for the loans from the National Bank of Baltimore he might be "justified in charging something additional for it"; that he did not put a value on plaintiff's services, "except that he felt that $1,600 represented $12,000 a year; that the brokerage for procuring loans was from nothing to two and a half per cent., and that he does not know that there is any rule and he does not think two and a half per cent. would be a fair rate for securing a loan on collateral; * * * that two and a half per cent. is an ordinary banking charge, but he can't see why there should be any compensation for it." Mr. Boone, who was called in rebuttal by the plaintiff, testified that he was the secretary and treasurer of

the Baltimore Finance Corporation, and that certificates of deposit of the Lafayette Bank were sold at a discount of two and one-half per cent. in the month of September, 1921.

It appears from the record in No. 105 of this term that the plaintiff in this case and H. Walter Ganster, Jr., were sued on the 8th of February, 1923, by the receiver of the Lafayette Bank to recover the balance of the mortgage debt of Karl M. Bubert and Nina.K. Bubert, his wife, mortgagors, on the following guaranty:

"Baltimore, Md., February 19th, 1921.

"For value received, and at the request of Karl M. Bubert and Nina K. Bubert, his wife, we, the undersigned, H. Walter Ganster, Jr., and William Penrose, hereby guarantee the payment of principal of note of Karl M. Bubert and Nina K. Bubert, his wife, dated February 19th, 1921, and payable to the order of the Lafayette Bank, one year after date, and secured by mortgage on property Nos. 104 and 106 South Charles Street, to William H. Haydon, which mortgage is to be assigned to the said Lafayette Bank, as collateral security therefor, and the liability of the undersigned shall not become due and payable until default in said mortgage, and sale and payment under foreclosure proceedings.

"H: Walter Ganster, Jr.,
"William P. Penrose.

Witness: Charles Mulligan."

The contentions of the appellee in the case are that it was incumbent upon the appellant to show that it was his intention, and the intention of the Lafayette Bank, that he should be compensated for the services he rendered the bank, and that he has not only failed to meet that burden, but that the evidence shows that his claim for compensation was an afterthought, for the purpose of meeting the claim of the receiver against him on the guaranty referred to. In this view, which was the one adopted by the court below, we cannot concur. The only evidence in the case tending to give the slightest color to the contentions of the appellee is the fact that the

claim was not filed in the receivership case until two dividends had been paid to the creditors of the bank, and the further fact that the appellant did not mention his claim to the receiver. But this is met by the positive and uncontradicted evidence that at the time the plaintiff was appointed special counsel he was asked by the board of directors of the bank what his charge would be, and that he told them he could not say in advance, because he did not know what and how much work he would have to do, and that if they could not agree on the compensation after the services were rendered they could submit it to arbitration, and the testimony of Mr. Ganster that he had urged the plaintiff for over a year to file his claim and that they had talked it over on many occasions in their office; that the plaintiff, following his habit of neglecting his own affairs, had neglected to do it, but that the amount of his claim had been determined upon and the claim had been typewritten before the plaintiff was sued. A creditor may come in and file his claim any time before the final distribution of an estate or of a fund in court. *Miller's Equity Procedure,* sec. 540. The appellee also relies on the fact that the plaintiff, in the case referred to as the *Montrose Building Association* case, stated, in reference to a charge that he and his partner had been securing loans from the bank for which he was compensated by his clients, that he had "never profited to the extent of one penny in any transaction with the bank except in the instance when he borrowed $40,000 for the bank and was paid a fee." That statement by the plaintiff is not contradicted in this case, and so far as the record discloses he never had, and has not yet, received any compensation "in any transaction with the bank" except the commission of $1,600, or $400, for obtaining the loan of $40,000 from the National Bank of Baltimore, which transaction was before he was appointed special counsel for the Lafayette Bank.

The cases cited by the appellee sustaining the rule that a director or officer of a corporation cannot recover for services rendered in the line of his duty, unless he can show an ex-

press contract, have no application to this case. The appellant was not an officer or a director of the Lafayette Bank. On the contrary, according to the uncontradicted evidence in the case, he was *expressly* employed as special counsel, with the understanding that if they could not agree on the compensation for his services after they were rendered they would submit it to arbitration. The mere fact that he was an officer of another corporation which was interested as a stockholder in the bank did not deprive him of the right to accept employment by the bank as special counsel, nor would it, even in the absence of express employment, justify the inference that the services were rendered without any intention on his part to charge, or expectation on the part of the bank to pay, for the same. In the latest case cited by the appellee (*Jamaica Trading Co.* v. *Dinning,* 141 Md., p. 322) this Court said that even a director or officer of a corporation may recover under an *implied promise* for services rendered by him "beyond the scope of his official duties, if accepted by the corporation." The fact that the appellant was the guarantor of a mortgage loan by the bank is also referred to by the appellee, but that fact does not warrant the inference that in serving the bank the appellant was serving his own interest, for his obligation under the guaranty could not have been affected by the success or failure of the bank.

It is also urged on behalf of the appellee that even if the appellant is entitled to compensation for the services mentioned, he is only entitled to one per cent. of the total amount borrowed by him. The evidence tends to show that the plaintiff, after he was employed as special counsel, borrowed for the bank $57,000 from the National Bank of Baltimore, $92,000 from the Equitable Trust Company, and about $50,000 from the Maryland Title Company, and this contention of the appellee is based on the evidence that the plaintiff received for securing a loan of $40,000 from the National Bank of Baltimore, before his appointment as special counsel, a commission of one per cent., or $400. Even if we were to assume that one per cent. of the loans obtained by the

plaintiff is a fair and reasonable allowance for such services, this view of the appellee entirely overlooks the other services rendered, including the collection of overdrafts to the amount of $13,000, professional advice, etc.

As the appellant was employed by the bank, we think he is entitled to fair and reasonable compensation for the services he rendered between the date of such employment and the time the State Bank Commissioner took charge of the bank on the 25th of November, 1921. But there is no evidence in the case as to what would be a reasonable allowance for the professional advice given or the collection of the overdrafts, and the evidence as to a proper allowance for securing the loans, amounting to $199,000, is far from satisfactory. The bankers who testified to the value of the appellant's services in securing the loans mentioned did not base their opinions upon their familiarity with the charges usually made or paid for such services in Baltimore City, nor did the plaintiff state the usual charge for such services, yet there would seem to be no reason why the value of any of the services rendered by the appellant should not be susceptible of satisfactory proof. As the court below did not pass upon the value of the appellant's services, we will reverse the decree and remand the case to the court below, with directions to allow the appellant for the services rendered by him upon the production of satisfactory evidence of their value.

> *Decree reversed with costs, and cause remanded in order that a decree may be passed in accordance with the opinion of this Court.*