FOLLY FARMS I, INC. ET AL. *v.* TRUSTEES OF THE
CLIENTS' SECURITY TRUST FUND OF THE
BAR OF MARYLAND

[Misc. No. 10, September Term, 1977.]

*Decided June 5, 1978.*

660

The cause was argued before Smith, Digges, Levine, Eldridge, Orth and Cole, JJ.

*John H. Zink, III,* for claimants.

*Richard A. Reid* for respondent.

Smith, J., delivered the opinion of the Court.

In the second trip of this controversy to this Court we are obliged to determine whether claimants, Folly Farms I, Inc. et al. (Folly Farms or the claimants), are entitled to reimbursement from the Clients' Security Trust Fund of the Bar of Maryland.[1] We shall consider whether the defalcation arose from an attorney-client relationship and whether the claimants were guilty of negligence. If the claim did not arise from such a relationship, or if the claimants were negligent, their claim for reimbursement by the Trustees of the Clients' Security Trust Fund (the trustees) must be denied. We shall hold that the trustees erred when they declined to approve the claim.

## 1. Background

The concept of a fund established by the legal profession to reimburse clients in the few cases in which attorneys betray their trust and misappropriate funds began in New Zealand, and then spread to other English-speaking countries.[2] Reginald Heber Smith, *The Client's Security Fund: "A Debt of Honor Owed by the Profession,"* 44 A.B.A. J. 125, 127 (1958), and *Time,* Sept. 16, 1966 at 69. Mr. Smith said, "Among the English-speaking and among the common law countries of the world, the United States is the laggard."

---

1. The first case was Folly Farms I, Inc. v. Trustees, 278 Md. 297, 363 A. 2d 479 (1976).

2. The Maryland State Bar Association Committee on Clients' Security Fund quoted the Baltimore City committee on the latter's 1960 report as having "made the point that the number of defaulting lawyers in the ten year period immediately prior to its report was 46/100,000 of 1% of the lawyers practicing in the city." *See* 69 Trans. Md. St. B. A. 364 (1964).

A.B.A. J. at 127 (Italics removed.) In Maryland a voluntary plan was established by the Bar Association of Baltimore City, followed by one set up by the Montgomery County Bar Association. After spirited debate the Maryland State Bar Association approved a proposal in July 1964 which would have requested the General Assembly to enact a bill establishing such a fund. *See* 69 Trans. Md. St. B. A. 209-34 and 365-71 (1964). Thereafter, a revised plan was submitted to the State Bar in January 1965 and unanimously approved. *See* 70 Trans. Md. St. B. A. 9-16, 339-42 (1965). It called for a legislative enactment authorizing this Court to promulgate rules and regulations for the creation and operation of such a fund. Subsequently, the General Assembly enacted Chapter 779 of the Acts of 1965, which became Md. Code (1957, 1976 Repl. Vol.) Art. 10, § 43. Under it this Court may require payment of a sum not to exceed $20 per year as a condition precedent to the practice of law. The general purpose of the fund, as set forth in the statute, is "for . . . maintaining the integrity and protecting the good name of the legal profession by reimbursing, to the extent deemed proper and reasonable by the trustees, losses caused by defalcations of members of the bar of the State of Maryland, acting either as attorneys or as fiduciaries (except to the extent to which they are bonded) . . . ." On March 28, 1966, this Court adopted what is now Maryland Rule 1228. This was followed immediately by the appointment of trustees. The fund became fully operative on July 1, 1966, when the trustees began to collect assessments. The annual assessment for lawyers admitted to practice five or more years prior to the beginning of the fiscal year was initially set at $15. This has since been reduced to $10.

Under Rule 1228 i, "[t]he trustees are invested with the power to determine whether a claim merits reimbursement from the trust fund . . . ." No claimant has any right in the trust fund as beneficiary or otherwise. In exercising their discretion, the trustees are to consider a number of factors, including the amounts available and likely to become available to the trust fund for payment of claims, the size and number of claims likely to be presented, the total amount of

losses caused by defalcations of any one attorney, the unreimbursed amounts of claims recognized by the trustees in the past as meriting reimbursement but for which reimbursement has not been made in the total amount of the loss sustained, the amount of the claimant's loss as compared with the amount of the losses sustained by others who may merit reimbursement from the trust fund, the degree of hardship the claimant has suffered by the loss, and any negligence of the claimant which may have contributed to the loss. Rule 1228 j 2 provides for judicial review. Under this rule a claimant aggrieved by a final determination of the trustees may file exceptions with this Court within 15 days. The rule provides:

> "The decision of the trustees shall be deemed prima facie correct and the exceptions shall be denied unless it is shown that the decision was arbitrary or capricious, or unsupported by substantial evidence on the record considered as a whole, or was not within the authority vested in the trustees, or was made upon unlawful procedure, or was unconstitutional or otherwise illegal."

Pursuant to the authority granted to them, the trustees have adopted regulations approved by this Court concerning claims, by which they say they "will be guided, but not necessarily bound." The first of these guidelines provides:

> "No claim will be recognized by the Trustees unless a fiduciary or client-attorney relationship existed with a member of the Bar of the Court of Appeals of Maryland when the loss was incurred and the said Maryland attorney defaulted."

### 2. Facts of this case

This case concerns the claims of four corporations, Folly Farms I, Inc.; Folly Farms II, Inc.; Folly Farms III, Inc.; and Folly Farms IV, Inc., to which we shall collectively refer as Folly Farms. Folly Farms filed a claim with the trustees on March 27, 1974, seeking reimbursement of losses caused by

the defalcations of William L. Jacob (Jacob).[3] The claim was denied on the ground that the evidence furnished by the claimants revealed that the proximate cause of the defalcations stemmed from Jacob's having been made a corporate officer with the authorization to sign checks on behalf of the corporation. The matter reached this Court in *Folly Farms I, Inc. v. Trustees,* 278 Md. 297, 363 A. 2d 479 (1976). We amended Rule 1228 effective September 15, 1976, to provide for the filing of exceptions to final decisions of the trustees which denied claims. We said in *Folly Farms:*

> "In view of the amendment to the Rule during the pendency of this case, we think it appropriate in the circumstances to treat the petition filed by Folly Farms as an exception taken to the trustees' decision and, without denying or sustaining the exceptions, to vacate the trustees' decision and remand the matter to the trustees for further proceedings. In this connection, we note that the trustees' decision denying the claim is not supported by any definitive factual findings relative to the application of the criteria governing the exercise of the trustees' discretion specified in Rule 1228 i 3. We think that the trustees, on remand, should give further consideration to the claim and state with specificity the reasons underlying their final determination."
> *Id.* at 301.

Upon the remand the trustees took testimony and then prepared a detailed and carefully reasoned opinion denying the claims.

Folly Farms owned land in Baltimore County. It was primarily concerned with the sale of undeveloped lots. Daniel B. Brewster, Esq., a practicing lawyer, was its president and sole stockholder. His law firm usually engaged the services of Jacob to examine titles to real estate. A half-interest in Folly Farms was sold by Brewster to another individual, Colonel Drummond, to whom later reference will be made.

---

3. Jacob was disbarred by this Court on April 14, 1975.

Brewster "retired" (as he put it) from the practice of law by virtue of the requirements of his duties in the Congress of the United States, first as a member of the House of Representatives and then as a United States Senator. Jacob was retained to represent the interest of the corporation at closings when lots were sold. The other part owner's health deteriorated, and Brewster's time was occupied from 1969 onward by legal difficulties arising from his indictment by a Federal grand jury in the District of Columbia. Jacob was made a corporate officer and given the authority to sign checks. The trustees said, "In the normal course of transactions, Mr. Knatz [, a realtor,] would sell a lot and then notify Mr. Jacob of the sale."

Five defalcations are involved in these claims. Four stemmed from settlements concerning sales to Hoffman, Stone, Hearn, and Easter. The trustees summarized the testimony relative to those matters:

"(a) The Hoffman transaction, according to the settlement sheet furnished by the Claimants, indicated that settlement took place at No. 6 Calvert Street, Baltimore, Maryland. It appears that this address is the address of a title company. Further, that the check would have been made payable to the Corporations and not to William L. Jacob, as attorney; further, that Jacob believed his procedure, under those circumstances, would be to endorse the corporate check and put it into his escrow account.

"(b) Settlement sheets submitted by the Claimants as to the Stone and Hearn settlements indicated that they were not closed by Jacob. Jacob testified that the settlement sheets were not in his handwriting, nor were the settlement sheets in the handwriting of his secretary. Further, Jacob did not remember how the checks were made payable, although he testified that he believed they were made payable to the Corporations and endorsed by him for deposit into his escrow account. Jacob testified that he attended settlements handled by

outside attorneys in order to deliver the deed of the Corporations to the purchaser at settlement, and that he also looked over the documents and papers as attorney for the corporations.

"(c) No settlement sheet was produced on the Easter settlement, although Jacob had testified that all his records had been delivered to Mr. Staehlin, CPA, for the Corporations."

As the trustees put it:

"The fifth defalcation represented a mortgage payoff by Elwood A. Sinsky on a purchase money mortgage. In this case Mr. Jacob's file was given to the Trustees and this file indicated that the mortgage was executed on January 16, 1973, to the Corporations, with the first payment being due on April 16, 1973.

"By letter dated May 9, 1973, Mr. Jacob wrote Mr. Sinsky to make the April 16, 1973 payment payable to 'Folly Farms I, Inc. and Folly Farms II, Inc.' and forward to 'my attention'."

The trustees summarized the issues as: (1) whether Jacob was acting as an attorney or a fiduciary when the defalcations took place, (2) whether he gained access to the funds by virtue of the fact that he was a corporate officer, and (3) whether the negligence of Folly Farms was so great that it precludes recovery in the instant case. They concluded:

"It is the opinion of the Trustees that William L. Jacob was able to commit the defalcations because he was a corporate officer authorized to endorse checks of the Corporations. This authority was given to him on October 15, 1971. Before that date the Corporations did not suffer any losses while Jacob was acting as attorney for them.

"Further, that four of the five defalcations arose out of settlements, not handled by William L. Jacob, but by either title companies or attorneys. No evidence was presented by the claimants which

would indicate that the checks from the settlements were made payable to William L. Jacob as attorney. To the contrary, the record indicates that these checks were probably made payable to the Corporations.

"The Trustees recognize that in many instances such as the instant case an attorney at law may perform services as an attorney as well as a corporate officer. They further believe that it was necessary for an officer of the Corporation to attend the settlements (as Mr. Jacob did as Vice-President) but that it was unnecessary for an attorney for the Corporation to be present. The proceeds of the sales and the Sinsky mortgage payment were net amounts with no necessity for further negotiation of the checks through Jacob's escrow account. They should have been delivered by him as Vice-President of the Corporation to Martin J. Staehlin, Jr. for deposit and credit to the proper Corporation. The Trustees believe that William L. Jacob came into possession of the monies, which he later appropriated to his own use, by virtue of the fact that he was a corporate officer with the power to sign checks for the Corporations.

"To extend the cloak of the Clients' Security Trust Fund to cover attorneys such as William L. Jacob, who are acting in dual capacities, without making any distinction as to the proximate cause of the defalcations may very well jeopardize the future funding of the Clients' Security Trust Fund.

"The remaining point considered by the Trustees is the negligence of the officer-owners and director-owners. Such gross negligence on the part of the claimants is clearly depicted in the testimony of Mr. Brewster and dictates that the claimants ought not to recover on the evidence presented.

"We deny the claim on two grounds:

"1. Jacob was the Vice-President of Folly Farms and the claim arose from his relationship as an officer of the Corporations, rather than from an attorney-client relationship or because he was an attorney acting in a fiduciary capacity.

"2. The negligence of the President of the Corporations contributed to the loss."

The record reflects that Jacob was not compensated as an officer or director, but for services as an attorney on an hourly basis.

The trustees in denying the claim quoted the following testimony of Mr. Brewster:

"... In the '60 years Colonel Drummond's health rapidly deteriorated and he was totally inactive at the end. In 1969 I was indicted by a Federal Grand Jury for a serious crime and thereafter was involved in legal proceedings in Federal Court for a period of some six years.

\* \* \*

"In the late sixties Colonel Drummond was in serious health [sic]. My time and attention was totally devoted to my affairs in Washington and I did not have the time to watch over the corporate affairs, to attend settlements. It became infinitely more convenient to have Bill attend to all of these details, therefore at his suggestion we named him as an officer and a director of the corporations . . . .

\* \* \*

"During the year '72 and '73, as I've said heretofore, I had no office, I was often in the hospital, and just as often it seems like in Federal Court or involved in Federal proceedings. I was difficult, if not impossible, to get hold of. The considerations that transpired about corporate affairs would be between Jacob and Bobby."

The trustees stated that the "gross negligence on the part of the claimants [was] clearly depicted in the testimony of Mr. Brewster . . . ." They may have had reference to that which we have just quoted or they may have had in mind Mr. Brewster's description of his discovery of the defalcations:

"In February of 1974 I was personally short of liquid assets because of the dreadful drain upon my personal assets for the extensive litigation I was then involved in and I went to Robert Knatz and Martin Staehlin, my personal friends, and in this case the realtor for and the accountant for the Folly Farms corporations, to see if we couldn't drain some money from the corporations to help me with current expenses. In reviewing the books with Martin Staehlin and Robert Knatz I immediately saw that Knatz had more lots sold than Staehlin had received funds for, there was a discrepancy. So, the minute that occurred to me, or the possibility occurred I that day went to Robert Knatz's office in Reisterstown and told Bobby that the corporate records show monies received for these lots, how many have you sold. There was a discrepancy. Bobby Knatz called Bill Jacob, in my presence, from his office and Bill stated to Bobby that he had personally taken the money for his own use."

Folly Farms has filed three exceptions to the holding of the trustees, (1) that it "was arbitrary and/or capricious," (2) that it "is unsupported by substantial evidence on the record considered as a whole," and (3) that it "is based on an erroneous conclusion of law."

### 3. Standard for review

As has previously been noted, under Rule 1228 j 2, the decision of the trustees is to "be deemed prima facie correct and the exceptions shall be denied unless it is shown that the decision was arbitrary or capricious, or unsupported by substantial evidence on the record considered as a whole, or

was not within the authority vested in the trustees, or was made upon unlawful procedure, or was unconstitutional or otherwise illegal." The standard for review of the decision of an administrative agency, to which this review is analogous, was stated for the Court by Chief Judge Hammond in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 309, 236 A. 2d 282 (1967), as "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." This has been repeated in a host of cases since then. *See, e.g., Shell Oil Co. v. Supervisor,* 278 Md. 659, 670, 366 A. 2d 369 (1976); *Pemberton v. Montgomery County,* 275 Md. 363, 367-68, 340 A. 2d 240 (1975); *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 225, 334 A. 2d 514 (1975); *Public Serv. Comm'n v. Balto. Gas & El.,* 273 Md. 357, 362-63, 329 A. 2d 691 (1974); *Dickinson-Tidewater v. Supervisor,* 273 Md. 245, 256, 329 A. 2d 18 (1974); *St. Comm'n on Human Rel. v. Malakoff,* 273 Md. 214, 224, 329 A. 2d 8 (1974); *Warlick v. Supervisor of Assess.,* 272 Md. 540, 546, 325 A. 2d 587 (1974); *Supervisor of Assess. v. Ely,* 272 Md. 77, 84, 321 A. 2d 166 (1974); and *Fairchild Hiller v. Supervisor,* 267 Md. 519, 521-22, 298 A. 2d 148 (1973). *See also* Tomlinson, *Constitutional Limits on the Decisional Powers of Courts and Administrative Agencies in Maryland,* 35 Md. L. Rev. 414 (1976).

### 4. Attorney-client relationship

We shall first consider whether, in the words of the rule, a "client-attorney relationship existed with a member of the Bar of the Court of Appeals of Maryland [, *i.e.,* Jacob,] when the loss was incurred and the said Maryland attorney defaulted." What constitutes an attorney-client relationship is a rather elusive concept. Richard L. Amster, Esq., treasurer and trustee of the Clients' Security Fund of New Jersey, has commented that defining such a relationship has been a major problem in the matter of administration of the New Jersey fund. *See* Amster, *Clients' Security Funds: The New Jersey Story,* 62 A.B.A. J. 1610 (1976):

> "During the eight years in which the fund has been operating a constantly recurring problem has

been the difficulty of the trustees in fitting the varied factual situations that have come before the fund within the definition established for the payment of claims. The definition of the lawyer-client relationship, which is a condition precedent to the consideration of a claim, is not always easily satisfied. The question as to when a lawyer is acting as a lawyer as opposed to acting as an investment adviser or a businessman continually recurs, and the trustees have struggled to interpret claims criteria so as to achieve the basic purpose of the fund." *Id.* at 1613.

This Court has considered the attorney-client relationship in a variety of situations. In *Brown v. Hebb,* 167 Md. 535, 175 A. 602 (1934), our predecessors discussed an attorney's power to "bind his principal by admissions of facts not in dispute, made when no cause is pending." The Court spoke in terms of agency, saying:

"The question is finally referable to the law of agency, for apart from his connection with actually existing litigation, an attorney would appear to be a mere agent, and, as a mere agent, his authority to bind his principal by his admissions or statements should depend upon the real or apparent scope of his agency, or, as announced in the *Restatement of the Law of Agency, A.L.I.* secs. 284, 286 . . . ." *Id.* at 546.

See *Prescoe v. State,* 231 Md. 486, 494-95, 191 A. 2d 226 (1963), relative to the power of an attorney to bind his client in the course of litigation, and *Cloverfields Imp. v. Seabreeze Prop.,* 280 Md. 382, 401-04, 373 A. 2d 935, 374 A. 2d 906 (1977), concerning a concession by an attorney made in this Court. Judge Shehan said for the Court in *Buechner v. Goodman,* 174 Md. 131, 136, 197 A. 586 (1938), "An attorney bears a fiduciary relation to his client with respect to any money received or collected by him," a statement which all will regard as beyond dispute.

Several Maryland cases have involved the question of whether an attorney-client relationship existed. In *Smith v.*

*Martin,* 154 Md. 462, 140 A. 593 (1928), our predecessors were faced with the question of whether such a relationship existed between a landowner and a lawyer-lessee who had drawn the lease in question. Judge Pattison said for the Court:

"It is true he was a lawyer, but he had at no time been [the lessor's] attorney, nor was he acting as her attorney in this transaction. ... [I]t was only to oblige and accommodate her that he agreed to prepare [the lease]. ... The fact that the defendant, a party to a contract, was an attorney, and that he was willing to prepare the lease without compensation, was not enough to establish the relation of attorney and client." *Id.* at 473-74.

We found the presence of an attorney-client relationship between an attorney and the assured in *Central Cab Co. v. Clarke,* 259 Md. 542, 548-50, 270 A. 2d 662 (1970), where an insurance company had sent a file to an attorney and he had written letters relative to the case to the plaintiff's counsel.

Our predecessors concluded in *Penrose v. Page,* 145 Md. 1, 125 A. 549 (1924), that a Baltimore attorney employed as "special counsel" in an effort to save a failing bank was entitled to a fee for his extensive services. The matter returned to this Court in *Page v. Penrose,* 147 Md. 225, 127 A. 748 (1925). What Judge Offutt said for the Court there is significant because the Court found Mr. Penrose to be entitled to attorney's fees even though his services were not of a legal character and could have been performed by a non-lawyer bank executive:

"Mr. Penrose was employed as a lawyer, and it is possible that his training and experience as a lawyer may have rendered his assistance more valuable to the bank, but it is difficult to point out any services rendered by him which could not have been rendered in ordinary course by a capable and experienced bank executive familiar with the needs, operation and management of banks. Indeed, there is great force in this suggestion of the learned and careful judge who heard this case in the lower court. In

speaking of the difficulty of separating the services into more or less conjectural elements and valuing each element, he said: 'This method of computation does not seem to me to be as satisfactory as to consider his services as those of an executive officer called in temporarily to do the administrative work of the president and board of directors, inasmuch as all of the services rendered by him would be rendered under ordinary circumstances by the executive officers of the company without compensation other than their salaries. The object of employing him was to maintain the bank as a going concern, in doing which the president and board of directors had failed.' But the appellee was employed in the special capacity of a lawyer, for he was employed as 'special counsel.' The bank, therefore, employed a practicing lawyer to give up his practice for forty-two days and devote his entire time to its affairs, and while his services may not, and so far as we can see were not, of a strictly legal character, nevertheless, it is just that he should have been compensated for the services he gave at the same rate as he would have been had they been strictly legal in character." *Id.* at 227-28.

The facts in *Huester v. Clements,* 252 Md. 641, 250 A. 2d 855 (1969), are somewhat analogous to the case at bar. Clements sought a location in Cecil County to set up a sawmill. A logger suggested that Mr. Huester might be able to help and the two of them went to see Huester, an attorney who was also serving as chairman of a local economic development commission. He showed Clements several possible sites, and eventually showed him land owned by Mrs. Huester which Clements leased. In a later dispute Huester acted as his wife's attorney. Clements testified that he had considered Huester to be his attorney from the time of their first meeting, while Huester said that when he helped Clements to find a site he was acting solely in his capacity as chairman of the economic development commission. On the issue of admissibility of evidence the trial court ruled that the

attorney-client relationship arose between Huester and Clements at the time of their first meeting. We found this to be correct. Others have been concerned with the existence of an attorney-client relationship from the standpoint of admissibility of evidence. *See, e.g., United States v. United Shoe Machinery Corporation,* 89 F. Supp. 357 (D. Mass. 1950); *United States v. Vehicular Parking,* 52 F. Supp. 751 (D. Del. 1943); *McCormick's Handbook of the Law of Evidence* § 88 (2d ed. 1972); Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L. J. 953, 969-78 (1956); and Note, *Nature of the Professional Relationship Required Under the Privileged Communication Rule,* 24 Iowa L. Rev. 538, 542-47 (1939).

Many out-of-state cases have discussed the matter of whether an attorney-client relationship was created in terms of contract law and the rules applicable to the relationship of principal and agent. *See, e.g., Kurtenbach v. TeKippe,* 260 N.W.2d 53 (Iowa 1977); *Anderson v. Lundt,* 200 Iowa 1265, 206 N. W. 657 (1925); *Grand Isle Campsites, Inc. v. Cheek,* 262 La. 5, 262 So. 2d 350 (1972); *Burt v. Gahan,* 351 Mass. 340, 220 N.E.2d 817 (1966); *Erickson v. Civic Plaza Nat. Bank of Kansas City,* 422 S.W.2d 373 (Mo. App. 1967); *Ex parte Schneider,* 294 S. W. 736, 738 (Mo. App. 1927); *Spier v. Thomas,* 131 Neb. 579, 269 N. W. 61 (1936); *C. C. Plumb Mixes, Inc. v. Stone,* 108 R. I. 75, 76, 272 A. 2d 152 (1971); and *Ewing v. Haas, Judge,* 132 Va. 215, 111 S. E. 255 (1922). Courts have considered an attorney-client relationship in terms of the handling of matters not purely legal in nature. *See, e.g., Dresden v. Willock,* 518 F. 2d 281 (3d Cir. 1975) (Situation where an attorney "who had experience in real estate and other commercial ventures" engaged to journey "to the Virgin Islands and look at possible alternate sites for the construction of a hotel ... [where he] negotiated with the owner and purchased the property for $900,000" began "as an attorney-client relationship."); *Smith v. Travelers Indemnity Company,* 343 F. Supp. 605 (M.D. N.C. 1972) (Attorney who received money for purposes of investment without any attendant legal obligations was held not covered by a lawyer's professional liability insurance policy.); *Turner*

*v. Turner,* 123 Ga. 5, 11-12, 50 S. E. 969 (1905) (Attorney was hired to obtain a loan, but attorney-client relationship did not come into being.); *Ellenstein v. Herman Body Co.,* 23 N. J. 348, 129 A. 2d 268 (1957) (Attorney hired as a labor consultant with contract using word "consultant" did not create attorney-client relationship so as to require the court to exercise its equitable powers of judicial superintendence of engagements between attorney and client to determine whether the contract was fair.); and *Avery v. Lee,* 117 App. Div. 244, 102 N.Y.S. 12 (1907) (An attorney for overseas clients received, passed upon, and forwarded offers to purchase property which was for sale. The court held the attorney was "not justified, on the ground of privilege, in refusing to permit the inspection and to deliver the letter and cablegrams [which were sought]," since he "was not acting in his professional capacity, but merely as an attorney in fact, virtually the same as a real estate broker, in negotiating the sale of the property.").

*Rouse v. Pollard,* 130 N.J. Eq. 204, 21 A. 2d 801 (1941), concerned the issue of whether a law firm was responsible for the defalcation of a member of their firm to whom moneys had been entrusted for investment by a client under circumstances where it was concluded that such funds were received by him individually. There was no allegation of fraud on the part of the firm. The New Jersey Court of Errors and Appeals said:

> "[W]e do not understand that it is a characteristic function of the practice of law to accept clients' money for deposit and future investment in unspecified securities at the discretion of the attorney, and we find to the contrary. It is possible that attorneys in isolated instances have done this; just as it is possible that a person of any profession or occupation has done so. It has not, however, been done by lawyers, in this jurisdiction at least, with such frequency or appropriateness as to become a phase of the practice." *Id.* at 209.

That lawyers in their dealings with clients fall into a
different category from others in their dealings with their
clientele is illustrated by *Dwyer v. Jung,* 133 N.J. Super. 343,
346, 349, 336 A. 2d 498 (Ch. Div.), *aff'd per curiam,* 137 N.J.
Super. 135, 348 A. 2d 208 (1975), holding, "A lawyer's clients
are neither chattels nor merchandise, and his practice and
good will may not be offered for sale," and that "the
restrictive covenant contained in the partnership agreement
of [a] former law firm . . . [was] . . . void as against public
policy."

The stated reason for creating the Clients' Security Trust
Fund was "for the purposes of maintaining the integrity and
protecting the good name of the legal profession by
reimbursing, to the extent deemed proper and reasonable by
the trustees, losses caused by defalcations of members of the
bar of the State of Maryland, acting either as attorneys or
as fiduciaries . . . ." Code (1957, 1976 Repl. Vol.) Art. 10, § 43
(b) (1). *See also* Report of the Committee on Clients' Security
Fund, 69 Trans. Md. St. B. A. 363, 367 (1964); Brazener,
Annot., 53 A.L.R. 3d 1298 (1973); Smith, *The Clients' Security
Fund: "A Debt of Honor Owed by the Profession,"* 44 A.B.A.
J. 125 (1958); Note, *Attorney Misappropriation of Clients'
Funds: A Study in Professional Responsibility,* 10 U. Mich. J.
L. Ref. 415, 424 (1977); Sterling, *A Clients' Security Fund,* 36
J. St. B. Cal. 957, 959 (1961); and Note, *The Disenchanted
Client v. The Dishonest Lawyer: Where Does the Legal
Profession Stand?,* 42 Notre Dame Law. 382, 384 (1967). The
concept that such funds should be created because the legal
profession owes a debt of honor to the victims of defalcations
by our erring brethren is one which has been repeated over
and over again. Indeed, Theodore Voorhees, Esq., of the
Philadelphia Bar, long-time chairman of the American Bar
Association committee on the subject, who was instrumental
in establishing a clients' security fund within the Philadelphia
Bar Association, told the Maryland State Bar Association
immediately prior to its unanimous approval of such a fund:

> "I don't know how you feel about it, this idea that
> when a member of the Bar embezzles his client's
> money that the rest of us can walk down the other

side of the street with our eyes averted. That has just never appealed to me at all. When I was appointed Chairman of the Clients' Security Fund Committee in 1958 or 1959 we only had one Clients' Security Fund in the country, that of Vermont, and we proposed to establish one in Philadelphia. After long discussion we had a very elaborate plan which was brought before our Bar Association, and after a prolonged debate it was quite decisively defeated. However, we got some of the opposition to join our Committee, and we brought it up again in a couple of months and it was voted by a very comfortable margin. Three months later a proposal to establish a Clients' Security Fund was brought before our Pennsylvania Bar Association, and with a good many of the Philadelphia opposition in the room the proposal was carried by a unanimous vote.

"Since that time ten other Counties in Pennsylvania have established their own separate supplementary funds, and I want to say that those funds in Pennsylvania have constituted the very best public relations that any Bar could possibly have. If any lawyer is asked about crooked lawyers or embezzlement in the Bar he can quickly reply, well we have got a Clients' Security Fund, and explain what that means and ask the person who is criticizing the Bar whether in their profession or in their business they have anything comparable, and very, very few people can answer yes." 70 Trans. Md. St. B. A. 11-12.

Judge Nochem S. Winnet, Chairman of the Administrative Board of the Pennsylvania Bar Association's Clients' Security Fund submitted to the Supreme Court of Pennslyvania a proposed rule which would provide:

"The claimant need not be a client of the attorney, but the monetary loss shall have arisen in connection with activities which are part of or generally perceived by the public to be incident to the practice of law."

*See* Comment, *Pennsylvania Clients' Security Fund — How Secure is the Public?,* 22 Vill. L. Rev. 452, 463 n. 90 (1977). Amster, *supra,* 62 A.B.A. J. 1610, states relative to the New Jersey experience:

"In the summer of 1976 the trustees amplified the definition of a compensable claim. The trustees now rely on a causal relationship as establishing a basis for payment and have established the following standard: 'But for the fact that the dishonest attorney enjoyed an attorney-client relationship with the claimant at the time of or prior to the loss, such loss could not have occurred.'

"In applying that standard, the trustees listed additional factors they will consider in interpreting the criteria for allowing a claim. These are: the disparity of bargaining power between attorney and client; their respective educational backgrounds and business sophistication; whether the attorney-client relationship overwhelmed the normal prudence of the claimant; or whether the attorney-client relationship gave the dishonest lawyer access to information of the client's financial affairs that would not ordinarily have been available.

"The application of these standards has resulted in the granting of awards in cases that at first blush might not appear to come within the concept of recoverable cases as generally recognized by clients' security funds across the country. Take the case in which an attorney, having knowledge of his client's financial affairs, invests the client's funds in a fictitious mortgage. The trustees have considered the faith, trust, and confidence that the client reposes in his lawyer, and if the facts reflect that but for that faith, trust, and confidence, the client would have exercised a greater degree of care in the selection of the investment, the claim has been approved for payment. In hearing after hearing claimants have expressed dismay and inability to accept the fact that their own attorney stole from

them. To a certain extent, that blind trust is reassuring, but it certainly has heightened the feeling of the trustees that in order to retain the respect of the public, the bar must make good on these claims.

"The fund's experience indicates that reimbursable types of fraud occur in a variety of forms: in modest estate cases; in the case of widows investing the death benefits of their husbands at a high rate of interest in order to maximize income for themselves and their children; and in the case of people of limited educational backgrounds, who by dint of hard work and frugal living have acquired modest personal estates, the extent of which they were obliged to communicate to their attorney at the time their wills were being prepared or some other legal transaction was taking place. In these cases the attorneys with special knowledge of the client's financial condition, the lack of sophistication of the client, the trust and confidence placed in the attorney, and the disparity of bargaining power between attorney and client require reimbursement to preserve the integrity of the profession." *Id.* at 1613.

The New Jersey approach was applauded in Note, *supra,* 10 U. Mich. J. L. Ref. at 427: "By focusing on the nature of the client's reliance on the attorney instead of on whether the transaction was part of an attorney-client relationship, the 'but for' test more accurately determines which client claims involve a professional debt of honor."

To the extent that he is not bonded, our fund would recognize the claim made against an attorney who is a trustee or an executor and converts to his own use the funds entrusted to his care. It is of interest, however, to note that in 1969 John W. Bryan, then chairman of the ABA Committee on Clients' Security Fund, commented that reimbursements should not be limited to those situations where the attorney was performing some legal task in the technical sense. His reasoning was that it is sometimes very difficult for the

average layman to distinguish between a dishonest attorney and a dishonest fiduciary:

> "Some funds by rule deny payment of claims when the lawyer was acting in the course of a fiduciary capacity rather than in a professional capacity as a lawyer. For example, when money comes into the possession of the lawyer who is acting primarily as an executor, trustee, escrow or investment conduit, some funds exclude claims.
>
> "The distinction may be a tenuous one in the public's eye. In the absence of a state statute requiring a realistic indemnity bond, subject to court approval, the better clients' security fund procedure may be to expand the voluntary coverage of the fund to the client whose lawyer is acting as a fiduciary, since the public is not prone to recognize the refined distinction." Bryan, *Clients' Security Fund Ten Years Later,* 55 A.B.A. J. 757, 759 (1969).

That the initial concept of the Maryland fund was similar to the "but for" test established in New Jersey is abundantly clear from a review of the debate at the 1964 annual meeting of the Maryland State Bar Association. *See* particularly the comments of Rignal W. Baldwin, Esq., and Sol C. Berenholtz, Esq., and the response of the chairman of the Maryland State Bar Association Clients' Security Committee, 69 Trans. Md. St. B. A. 225-26, 232-34 (1964).

The Trustees of the Clients' Security Trust Fund are granted wide discretion. They serve without compensation. They are conscientious in their endeavors to both protect the good name of Maryland lawyers and to protect the integrity of the funds entrusted to their care.[4] For all of this they are

---

4. It is unfortunate that more publicity has not been received by the Maryland fund. The annual reports of the trustees on file with this Court reflect that between the official start of the fund on July 1, 1966, and June 30, 1977, a total of $213,848.60 has been paid out on claims. A total of 99 claims were approved. The trustees collected in that period by way of contributions from Maryland lawyers the sum of $818,742.44, and $7,093.73 by way of restitution. The fund balance on June 30, 1977, stood at $604,537.96, making it one of the largest such funds in the United States, if not the largest. It is interesting to note that although the fiscal year 1976-77

to be commended. We conclude, however, that they were too strict in this instance in their determination of what constitutes an attorney-client relationship. Lawyers today are involved in numerous activities outside the field of litigation and beyond such conventional legal activities as preparing documents, settling estates, and the like. We fear that if the existence of an attorney-client relationship were to be determined upon the basis of the traditional role of an attorney, we would fall short in our clients' security funds of accomplishing the ideal of protecting the public image of the bar and at the same time compensating wronged individuals in those rare instances in which our brethren go astray. Thus, we adopt the New Jersey standard for making this determination: but for the fact that the dishonest attorney enjoyed an attorney-client relationship with the claimant at the time of or prior to the loss, could such a loss have occurred? In this instance application of such a standard would indicate that the claims are compensable if the other criteria for reimbursement were met.

## 5. Negligence of the claimants

It will be recalled that the trustees denied the claims of Folly Farms both because of the absence of an attorney-client relationship and because "[t]he negligence of the President of the Corporations contributed to the loss." Accordingly, our

---

was a bad one for the fund with $84,347.96 paid out in claims against contributions of $78,056.98, the fund balance declined only $1,046.57 because of the investment policy of the trustees (government securities), the measures taken relative to restitution, and the fact that the trustees have kept operating costs at a minimum. In fact, during the same period the trustees have collected a total of $262,278.73 in interest.

The minuscule number of Maryland attorneys involved in defalcations is demonstrated by the above figures. A number of claims involved the same attorney. If, however, each claim had involved a different lawyer this would work out to an average of less than .001 of the attorneys in Maryland involved in defalcations each year. This increase from the time of the Baltimore City 1960 report may be accounted for by the fact that now that there is a possible source for reimbursement, aggrieved persons have come forward who otherwise might have said nothing relative to an attorney's conduct. Rule 9 of the trustees requires referral to the Attorney Grievance Commission prior to payment and that "wherever practicable" "final action . . . on the grievance by said Commission" shall be "a condition precedent to the payment of any claim . . . ."

conclusion on the issue of the attorney-client relationship does not dispose of the matter.

Rule 1228 i 3 enumerates certain factors which "the trustees may consider, together with such other factors as they deem appropriate," when they "exercis[e] their discretion" in the matter of approval of claims. The last factor there enumerated (vii) is "[a]ny negligence of the claimant which may have contributed to the loss." The term "negligence" as thus used is as difficult to define and to apply as a determination of what constitutes an attorney-client relationship. The trustees heard the witnesses and, under standard procedure for review in such cases, we take no issue with their factual conclusions. We are faced, however, with their legal conclusion that those facts amount to such negligence on the part of the claimants as would disqualify the claim.

At this point we are not obliged to define just what might be negligence, but must determine whether the conduct of the officers of the corporation, and that of Brewster as president in particular, amounts to negligence. In other words, does his failure to make any inquiry into the affairs of the corporation of which he was president constitute such negligence as would bar recovery? As we see it, Brewster's conduct here must be evaluated no differently from that of an individual who is a co-executor with an attorney where an estate is receiving payments of dividends or other funds which come to the office of the attorney and which he is expected to deposit in the estate account. Would a lay co-executor be negligent if he did not on a monthly basis request the attorney co-executor to list down the items received and then proceed to reconcile this with the bank account? We think not; it is not negligence to trust one's attorney in the absence of facts which put one on notice or ought to put the client on notice that inquiry should be made.

The reasons which dictate that a determination of what constitutes an attorney-client relationship for purposes of reimbursement from a client security fund should be under the "but for" test likewise dictate that "negligence" as used in this context must be given an interpretation somewhat

different from that applied by the trustees. Conceivably, there might be a point in time when the failure of a corporate president such as Brewster to request an accounting would mount up to such negligence as would bar reimbursement for the attorney's defalcation. That point was not reached here.

> *Exceptions sustained; costs to be paid by the Trustees of the Clients' Security Trust Fund of the Bar of Maryland.*