551 A.2d 465

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Van Stuart POWERS.

Misc. (Subtitle BV)

No. 26, Sept. Term, 1987.

Court of Appeals of Maryland.

Jan. 9, 1989.

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Asst. Bar Counsel, for Attorney Grievance Com'n of Maryland.

Van Stuart Powers, Hyattsville, pro se.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

The Attorney Grievance Commission charged Van Stuart Powers, a Maryland lawyer since 1972, with multiple violations of the Code of Professional Responsibility.[1] We referred the matter to Judge G. Hovey Johnson of the Circuit Court for Prince George's County pursuant to Maryland Rule BV9 b. After extensive fact-finding, Judge Johnson concluded that Powers was guilty of numerous violations of the Code. Although Powers takes issue with some of Judge Johnson's findings, as to which there was some conflicting evidence, our review of the record persuades us that those findings are all supported by clear and convincing evidence. We overrule Powers's exceptions. *See, e.g.,* *Attorney Griev. Comm'n v. Harris*, 310 Md. 197, 208, 528 A.2d 895, 900 (1987) (hearing judge's findings of fact will be sustained if supported by clear and convincing evidence); *Attorney Griev. Comm'n v. Parker*, 306 Md. 36, 45, 506 A.2d 1183, 1188 (1986) (same); *Attorney Griev. Comm'n v. Collins*, 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983) (same).

---

1. Powers's misconduct occurred while the Code of Professional Responsibility was still in effect. Current provisions governing lawyer conduct are found in the Maryland Rules of Professional Conduct that took effect 1 January 1987. Maryland Rule 1230 and Appendix.

The transgressions at issue here arose out of three separate and distinct sets of circumstances. The simplest set is that involved in the complaint of Clint A. Lauderdale. At a church benefit auction, Lauderdale had the misfortune to purchase two hours of legal consultation with Powers. As a result, Lauderdale retained Powers to handle two matters, each of a minor and relatively simple nature. The retainer was paid on 18 November 1983. In one matter, a collection case, Powers waited until about 15 February 1985 to advise Lauderdale that it would not be cost-effective for an attorney to proceed with it. In the other, a minor property damage claim, Powers neglected to file suit for almost two years after receiving the Lauderdales' check for filing fees. Only after the Lauderdales filed a complaint with the Commission did Powers take action. In July 1986, Powers filed suit and settled the claim for an amount acceptable to Lauderdale. What we have here, essentially, is neglect and failure to represent a client zealously. Judge Johnson found violations of DR's 6–101(A)(2), (3) and 7–101(A)(1), (2), (3).

The second set of circumstances, more serious and more complex than the Lauderdale affair, is the subject of a complaint initiated by the Commission's inquiry panel. It appears that until 1986 Powers maintained several noninterest bearing escrow accounts. At some point in that year, during a casual conversation "with a couple of lawyers at the Old Town Inn," Powers learned that "lawyers could have interest-bearing accounts." Without troubling to check further into the matter, for example, by reviewing Maryland Code, Article 10, § 44,[2] Powers proceeded to

---

2. As Article 10, § 44 stood in 1986, it read:

> (a)(1) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposit moneys or other trust moneys, of whatever kind or nature, such moneys, in the absence of court order to the contrary shall be expeditiously deposited in an account or accounts maintained as a separate account or accounts for funds belonging to others. In no event shall the attorney commingle any such funds with such attorney's funds or use any such funds for any

establish interest-bearing accounts, into which he sporadically transferred clients' money from noninterest bearing

---

purpose other than the purpose for which they were entrusted to the attorney.

(2) Each attorney shall have discretion to determine whether such trust moneys are to be deposited in a noninterest bearing checking account, in an interest bearing checking account, in one or more savings accounts, in one or more accounts subject to negotiable orders of withdrawal ("NOW accounts"), or in any combination thereof with any bank or savings and loan association authorized by federal or State law to do business in this State. If in the judgment of the attorney any trust moneys received from any client or beneficial owner are too small in amount or are reasonably expected to be held for too short a period of time to generate at least $50 of interest or such larger amount of interest as in the judgment of the attorney may be equivalent to the cost of administering an account for the benefit of the client or beneficial owner, such moneys may be pooled and commingled by the attorney with other such moneys held for other clients or beneficial owners, and the aggregate interest earned on such commingled account shall be paid at least quarterly, net of any service charges, by the depository bank or savings and loan association, to the Maryland Legal Services Corporation exclusively for the charitable purposes defined in its statutory charter.

(3) The implementation of programs for the generation of interest on attorneys' trust accounts for charitable purposes pursuant to subsection (a)(2) of this section shall be optional, not mandatory, and no attorney shall be liable in damages if such attorney continues to maintain such trust moneys in noninterest bearing checking accounts separate and apart from such attorney's own funds as required by subsection (a)(1) of this section and in accordance with law and the Code of Professional Responsibility.

(4) Except for trust moneys placed by the attorney in a commingled account for charitable purposes pursuant to subsection (a)(2) of this section, trust moneys in the hands of attorneys may be invested in any other investment vehicle specified by the client or beneficial owner or as they and the attorney may agree upon.

(b) Any attorney wilfully violating the provisions of this section shall be charged with professional misconduct, malpractice, or conduct prejudicial to the administration of justice and shall be proceeded against for reprimand, suspension, or disbarment under any applicable provision of this article or any other law or the Maryland Rules.

(c) Any attorney wilfully violating the provisions of this section, in addition to the penalties set forth in subsection (b) of this section, shall be guilty of a misdemeanor for each such violation and, on conviction thereof, shall be fined not more than five thousand dollars ($5,000) or be imprisoned for not more than five (5) years, or both in the discretion of the court.

For present purposes, the significant language is that contained in paragraphs (2), (3), and (4) of subsection (a). It was added by Chapter 830, Acts of 1982.

escrow accounts, intermingling these funds on occasions with his own money. He kept no records by which he could readily identify whose money was being moved around. He removed money from the interest-bearing accounts in a similarly whimsical fashion. For the most part, he kept the interest himself, although once, when a client demanded it, he attempted to compute the interest on that client's money and sent it to him. He transmitted no interest to the Legal Services Corporation. *See* Art. 10, § 44(a)(2), (3). Judge Johnson found violations of Article 10, § 44 and DR 9–102(A), (B).

Finally, we come to the complaint of Mary Shaw. Marge Atwell, a former client of Powers, introduced him to Mary Shaw in July 1982. At that time Atwell and others in her family resided with Shaw and helped care for her. Shaw was an elderly widow, of limited education, and not in the best of health.[3] Shaw wanted a will and generally needed help with her affairs. Powers first had Shaw execute a power of attorney, naming him as her attorney-in-fact. Next, he had the names of her sister and brother-in-law removed from Shaw's accounts. These included four certificates of deposit, totalling $35,000, and a checking account. In January 1983 Powers prepared and Shaw executed a declaration of trust naming him as trustee and conveying to him, in that capacity, virtually all of Shaw's assets (her home and the aforementioned CDs and bank account).

Powers's management of Shaw's affairs, as attorney and trustee, was abysmal. He failed to prepare and file income tax returns timely, thus incurring (for Shaw) penalties for the year 1982. He failed to pay 1983 property taxes on the

---

**3.** Judge Johnson observed that at the hearing before him, Shaw was confined to a wheelchair and "was unable to read and understand the documents presented to her in open court." He also noted that Powers, at the beginning of his representation of Shaw, had her examined by a doctor who found her mental condition to be good. At the hearing, however, Judge Johnson found it obvious that "Mrs. Shaw is confused, disoriented and unable to remember past occurrences."

house, which was sold at a tax sale on 11 June 1984, and was not redeemed until 18 September 1984,[4] at further expense to Shaw's estate. His late payment of utilities bills resulted in Shaw's service being interrupted. Moreover, he failed to assure (until January 1985) that only he had access to Shaw's checking account. Atwell and her daughter had induced Shaw to pay them substantial funds from this account. Bank statements for October and November 1984 contained cancelled checks totalling $2,800 written to Atwell, her daughter, or both. Powers was unaware of this because he never examined the bank statements with any care and never reconciled them. In fact, he testified (and confirmed at argument before us) that he did not and does not know how to reconcile a bank statement.

In December 1984 receipt of a particularly bulky bank statement prompted Powers to look at it, and he found over $5,000 in checks payable to Atwell, her daughter, or both. After that, he closed the old checking account, but he recovered only $275 from Atwell.[5]

Eventually, Shaw's sister intervened. On 30 October 1985, at the sister's insistence, Shaw filed a complaint with the Commission. Powers's response was to pay himself $1,500 in legal fees—fees for which he never billed Shaw; indeed, he never informed her that he had paid himself. On 26 November 1985 Shaw signed a letter, written by her sister, discharging Powers. Powers prepared an authoriza-

---

4. Powers argues that the home was not sold at a tax sale, but only advertised for sale. There is conflicting evidence on this point, but Judge Johnson's finding that there was a sale is supported by a certificate of tax sale. This disagreement may demonstrate no more than Powers's failure to comprehend the mechanics of a tax sale. But in any case, it is clear that Shaw was never actually put out of her house because of the tax delinquency.

5. Powers testified that Shaw did not want him to press criminal charges against Atwell or to recover the money because it was Christmas time and the Atwell family "need[ed] Christmas presents too." At the hearing before Judge Johnson, Shaw, contrary to her testimony before the inquiry panel, denied that she had intended that the Atwells keep the money.

tion to make the necessary arrangements to return her property to her and to deduct therefrom his legal fees. Once again, he paid himself $5,668 for legal fees and $261.83 for costs, without any billing or accounting to Shaw. He returned to her some $14,500 in cash, as opposed to the over $35,000 he had received from her in January 1983. As part of this winding up process, he cashed prematurely, and without Shaw's permission, a CD, thereby incurring a penalty of $420.70. The last of Shaw's money was finally returned to her at the first inquiry panel hearing in this case, in October 1986—almost a year after Shaw had discharged Powers.

The Commission did not charge Powers with actual misappropriation of any of Shaw's money. Rather, the complaint was gross mismanagement and neglect of her affairs and funds, failure to represent her zealously, and failure to keep property segregated and to prepare and render appropriate records and accounts, all to the considerable detriment of Shaw. Judge Johnson found violations of DR's 6–101(A)(1), (2), (3); 7–101(A)(1), (2), (3); and 9–102(B)(3), (4). He also found violations of DR 1–102(A)(1), (4), (5), (6).

In his overall conclusion, Judge Johnson additionally determined that Powers had violated DR 1–102(A)(3) (illegal conduct involving moral turpitude).[6] Such an extensive list of serious violations ordinarily would call for the imposition of a most serious sanction. *See, e.g., Attorney Griev. Comm'n v. Marano,* 306 Md. 792, 511 A.2d 512 (1986) (neglect of estate); *Attorney Griev. Comm'n v. Cockrell,* 304 Md. 379, 499 A.2d 928 (1985) (neglect, commingling and misappropriation of funds); *Bar Ass'n of Balto. City v. Carruth,* 271 Md. 720, 319 A.2d 532 (1974) (commingling and failure to account). But there are factors here that persuade us not to do so.

---

**6.** Judge Johnson additionally found a violation of DR 1–102(A)(2), but no such violation was charged by the Commission.

When a lawyer's misconduct is caused by alcoholism, drug addiction, or a mental disorder, the usual sanction is indefinite suspension. *See, e.g., Attorney Griev. Comm. v. Reid,* 308 Md. 646, 521 A.2d 743 (1987); *Attorney Griev. Comm'n v. Willemain,* 305 Md. 665, 506 A.2d 245 (1986); *Attorney Griev. Comm'n v. Shaffer,* 305 Md. 190, 502 A.2d 502 (1986). This provides the requisite protection for the public, for it prevents the lawyer from practicing law until such time (if ever) that he or she can demonstrate that he or she is free from the effects of the ailment and able to practice competently. At the same time, the lawyer is spared the ultimate sanction of disbarment, a sanction which would be unfair to apply where the lawyer's conduct is caused by factors beyond his or her control. *See Reid,* 308 Md. at 651, 521 A.2d at 745–746. This is such a case.

Expert witnesses produced by both the Commission and Powers agreed that Powers had been an alcoholic since his youth, that at the time pertinent here, he suffered from alcohol abuse and dependency and from moderately severe depression. Dr. Ellen McDaniel, a psychiatrist testifying for the Commission, explained that in her view, there was "no ... kind of unethical, self-serving pattern," but rather, that Powers's misconduct was directly related to alcoholism and depression. Moreover, the medical experts tended to agree that severe psoriasis, a skin disease now in remission, but not at the pertinent times, contributed to Powers's emotional or psychiatric difficulties, and to his inability to conduct his law practice properly.[7] The sanction to be imposed here is indefinite suspension.

Furthermore, there are factors here that persuade us that we should allow Powers to move to lift the suspension after it has been in effect for 90 days. The picture we have before us is not that of a fundamentally dishonest lawyer, but that of a man beset by serious disorders that rendered him incapable of operating his practice competently. We

---

7. Powers also had a severe knee problem (he was a candidate for an artificial knee replacement) and serious back difficulties.

are prepared to permit Powers to resume the practice of law, under appropriate conditions, if he can persuade us that his disorders can likely be overcome, that with proper supervision he can practice without danger to his clients, and that the determinable financial harm he has caused will be remedied. *See Reid, supra.*

It appears that Powers has abstained from the consumption of alcoholic beverages since the latter part of 1986. Judge Johnson found that since December of that year Powers has faithfully attended Alcoholics Anonymous meetings. Moreover, he is regularly engaged in psychiatric group therapy sessions. All of his treating physicians agree that Powers has taken significant steps towards recovery. This view is shared by Dr. McDaniel, who testified for the Commission, and by Richard Vincent, director of the Maryland State Bar Association's Lawyer Counseling Committee. Moreover, the consensus supports a favorable prognosis if Powers continues his present commitment to treatment for a period of two to three years.

Additionally, a lawyer has agreed to monitor Powers's practice, and a certified public accountant has undertaken to review his accounting records and bookkeeping practices.

The financial picture is a bit more cloudy. With respect to the Mary Shaw case, the Commission questions only the manner, not the amount of fees Powers paid himself, and it is clear that he did perform services for Shaw over a period of time. Furthermore, the Commission does not (as best we can determine) press for restitution of any portion of the $5,000 obtained by Atwell and Walters; this may be because of Shaw's own equivocations as to whether she wished to recover that money. We put these matters aside.

Nevertheless, precisely what amounts should be returned to Shaw is uncertain. At oral argument the Commission seemed unable to be specific on this point; it advanced

figures totalling $722.25.[8]  Powers estimated the amount he should repay to be in the neighborhood of $1,200.  The figures we glean from the record are:

| | |
|---|---:|
| Penalty on early redemption of CD | $ 420.70 |
| Interest and penalty on 1982 income taxes | 162.25 |
| Attorneys fees incurred by Shaw in connection with correcting income tax problems | 560.00 |
| Costs of tax sale redemption | 188.81 |
| Interest or penalty—late payment of 1985 property tax | 29.08 |
| | $1,360.84 |

This figure, we note, is fairly close to Powers's estimate.

As to the interest-bearing accounts, the situation is even muddier.  It is not at all clear that it can be determined from Powers's records what interest was earned on which clients' accounts, or what sum, if any, should be paid to the Legal Services Corporation.  At oral argument, Powers estimated the amount of interest involved to be $7,000, and he expressed willingness either to make refunds to his clients or to pay the money to Legal Services.

In view of all these circumstances, we shall suspend Powers from the practice of law indefinitely, effective 30 days from the date this opinion is filed.  At the expiration of 90 days from the effective date of the suspension, Powers may apply for reinstatement upon a showing that:

1.  His participation in Alcoholics Anonymous and in group therapy have continued successfully and to the satisfaction of Mr. Vincent, Dr. George Hall, and Dr. Joseph Chambers (the doctors are psychiatrists who have treated Powers) since the hearing before Judge Johnson;

---

8.  In matters such as this, it would be extremely helpful if the Commission provided clear financial computations and succinct tabulations. We should not have to fossick through the record for this sort of information.

2. A certified public accountant, acceptable to Bar Counsel, has reviewed Powers's financial records and books of account and has established a workable system of maintaining financial records that is understood by Powers and can be operated by him or under Powers's supervision;

3. Bar Counsel and Powers have reached agreement as to the amount to be repaid Ms. Shaw, and that amount has been repaid to her;

4. Bar Counsel and Powers have agreed upon a plan for payment to clients or to the Legal Services Corporation of the amounts earned on interest-bearing escrow accounts; and

5. Powers has paid all costs associated with this case.

If Powers is reinstated, the reinstatement will be subject to these continuing conditions:

1. Powers shall maintain active membership in, and participation with, Alcoholics Anonymous;

2. He shall continue participation in his present group therapy program until further order of this Court;

3. His activities in connection with the practice of law shall be monitored by a lawyer satisfactory to Bar Counsel, who shall submit reports to Bar Counsel on a quarterly basis for a period of two years, unless sooner relieved of that obligation by an order of this Court. The monitor's consent to so act shall be appended to any motion for lifting the suspension;

4. His books of account and financial records shall be monitored by a certified public accountant satisfactory to Bar Counsel, who shall submit reports to Bar Counsel on a quarterly basis for a period of two years, unless sooner relieved of that obligation by an order of this Court. The monitor's consent to so act shall be appended to any motion for lifting the suspension;

5. He shall dispose of the interest on the escrow accounts pursuant to the agreement between him and Bar Counsel.

A breach of any one of the above conditions shall be grounds for the renewal of Powers's suspension.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV15c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST VAN STUART POWERS.