572 A.2d 174

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**James F. CLEMENTS.**

**Misc. (Subtitle BV) No. 18, Sept. Term, 1988.**

Court of Appeals of Maryland.

April 17, 1990.

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Asst. Bar Counsel, for the Attorney Grievance Comm'n of Maryland.

Mark J. Friedman and George A. Nilson, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr. (retired) Specially Assigned.

RODOWSKY, Judge.

Respondent, James F. Clements (Clements), excepts to findings and conclusions of Judge Robert C. Nalley that Clements had violated then governing Disciplinary Rule 1–102(A)(4). *See* Maryland Rules (1986), Court Administration Rule 1230, Appendix F, Code of Professional Responsibility, Rule 1–102(A)(4).[1] In the refinancing of a mortgage on an office building, Clements, one of a group of investor-borrowers, did not personally and affirmatively disclose to the new lender an arguably effective, prior assignment of rents for security purposes which would not be released as part of the transaction. We shall dismiss the charge because, under all of the facts here, there is legally insufficient proof to establish a violation by clear and convincing evidence.

The premises 9301 Annapolis Road, Lanham, Prince George's County, Maryland are improved by a three-story

---

1. The pertinent portion of the rule is:
 "Disciplinary Rule 1–102. Misconduct.
 (A) A lawyer shall not:
 . . . .
 (4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

office building (the Property). In 1980 the Property was owned by 9301 Annapolis Road Limited Partnership consisting of Sigitas Zubkus, Jack Diener and Idalee Diener (collectively, the Zubkus Group). The Property was encumbered by a first deed of trust in favor of Baltimore Life Insurance Company (Baltimore Life) in the original principal amount of $325,000. That loan was further secured by a financing statement recorded in the county land records. A second lien against the Property was a deed of trust in favor of Union Trust Company of Maryland (Union Trust) in the original principal sum of $105,000.

During the same period Clements was practicing law with a firm of four attorneys, Callahan and Clements, whose principal office was in Crofton, Anne Arundel County. The attorney who was listed fourth on the firm's letterhead was Thomas E. Kelly, Jr. (Kelly). He has since died. Clements was also a manager for Stewart Title Guaranty Company (Stewart Title), a title insurer headquartered in Houston, Texas. Clements's responsibility was overseeing Stewart Title agencies in Maryland, the District of Columbia and West Virginia. Stewart Title of Maryland, Inc. (Stewart Md.), a company in which Clements was a shareholder, was an agent for Stewart Title. The president of Stewart Md. was Christina Dunn, then Christina Ellison (Dunn). The offices of Stewart Md. were next to the building in Crofton where the Callahan and Clements offices were located. One of Clements's business associates in personal investments was his accountant, Joseph Poole (Poole). Another of Poole's clients was a New York resident, Gene Michael Hostage (Hostage).

In 1980, Clements, Poole, and Hostage purchased all of the partnership interests of the 9301 Annapolis Road Limited Partnership (ARLP). The buyers agreed to assume the existing deeds of trust and to pay the sellers approximately $229,000 on a deferred basis, evidenced by promissory notes to the selling Zubkus Group. The notes were secured by a third deed of trust on the Property.

Baltimore Life then took the position that the third trust violated the terms of its loan and threatened foreclosure. In an effort to stave off foreclosure, the Zubkus Group, represented by their independent counsel, and ARLP, represented by Clements, took at least four steps: (1) The Zubkus Group released the third trust; (2) ARLP, as debtor, executed a financing statement to the Zubkus Group as creditor; (3) ARLP covenanted that it would not further encumber the Property; and (4) Clements and Poole executed on behalf of ARLP, as its general partners, an "Assignment of Leases, Rents and Profits as Additional Collateral Security," dated January 29, 1981.

The assignment was copied into the Land Records of Prince George's County on January 30, 1981, but, for reasons which have not been fully explained in the record in this case, the document was never indexed. This lack of indexing has led to an assumption or conclusion, embodied in the testimony of a number of witnesses in this case, including Clements, that the recording was legally ineffective.[2] Clements testified, without contradiction, that counsel representing the Zubkus Group undertook to record the assignment. His testimony also strongly suggested that the lack of indexing may not have been accidental. The instruments described as items (1), (2) and (3) above were recorded and apparently indexed but have not been introduced in evidence in these proceedings.

The above-described modifications to the security held by the Zubkus Group did not deter Baltimore Life from pursuing foreclosure. As a result, ARLP concluded that it would have to refinance. In order to buy time to arrange long term refinancing, ARLP also sought an interim loan with which to purchase the note held by Baltimore Life. Poole then brought another of his clients into the picture, a

---

**2.** For cases in which recorded but unindexed instruments were held to be effectively recorded, see *Frank v. Storer*, 308 Md. 194, 517 A.2d 1098, *rev'g* 66 Md.App. 459, 504 A.2d 1163 (1986); *Standard Fin. Co. v. Little*, 159 Md. 621, 152 A. 264 (1930).

shipping consultant, Altaf Ali (Ali). In return for a twenty percent interest in the Property, and with an assurance that he would be reimbursed by April 10, 1981, Ali agreed to provide the funds for the purchase of the Baltimore Life note. That purchase was accomplished on March 10.

Clements and Poole (ten percent each) as general partners, and Hostage (sixty percent) and Ali (twenty percent) as limited partners, formed Saudi Limited Partnership (Saudi) for the purpose of taking title to the Property. In the meanwhile Clements was seeking a loan from John Hanson Savings & Loan, Inc. (John Hanson), through its service corporation. On April 15 the John Hanson executive committee approved in principal a loan to the individuals comprising Saudi for $475,000, with interest of sixteen percent per annum and three points, for a minimum five year term, with twenty-five year amortization, to be guaranteed by the principals and their wives, provided that a new M.A.I. appraisal of the Property valued it at $650,000 or more.

Under date of April 10, Stewart Md., through Dunn, issued to John Hanson a binder for mortgagee title insurance. Among the "requirements to be complied with" that binder listed the following:

> "*Item 8.* Subordination to the lien to be insured hereunder [of] a Financing Statement dated January 29, 1981 and recorded among the Land Records of Prince George's County, Maryland in Liber 5367, folio 251 and a Covenant Not To Encumber dated January 29, 1981 and recorded among the Land Records of Prince George's County, Maryland in Liber 5367, folio 253, securing Sigitas Zubkus, Jack Diener and Idalee Diener, his wife."

The original of the binder, produced at the hearing before Judge Nalley from the files of John Hanson's loan closing department, was stamped as having been received by John Hanson on April 16, 1981, at an office in Forestville, Maryland. According to Carlton M. Green (Green), the general counsel of John Hanson, a Mr. Wilbert in the loan closing department would have been responsible for review of that binder.

By binder No. 324009 dated April 16, Stewart Md. deleted Item 8 from the binder dated April 10.

On April 16 John Hanson issued a written commitment to its service corporation to make a $475,000 loan, and by written commitment dated April 20 the service corporation committed to the individuals comprising Saudi. That commitment contains two paragraphs numbered fourteen, one entitled *"ASSIGNMENT OF RENT"* and the other captioned *"LEASES."* The borrowers agreed that they would not assign the rents without John Hanson's consent and that, in the event of their default, they would assign the rents and the leases to John Hanson. The individual partners of Saudi and Saudi, by Clements, formally accepted the commitment by their signatures executed on the twenty-fifth and twenty-sixth of April.

By another binder dated April 22, Stewart Md. cancelled its original binder of April 10 and its endorsement 324009 which had eliminated Item 8. Apparently that same day Stewart Md. issued a new binder to John Hanson, No. 290291, bearing the "effective date" of April 10.[3] The only special requirements for policy issuance were (1) a deed from ARLP to Saudi; (2) release of the deed of trust securing the note previously held by Baltimore Life and then held by Ali; (3) release of the deed of trust securing Union Trust; (4) a deed of trust from Saudi to John Hanson; and (5) a financing statement from Saudi to John Hanson. In other words, Stewart Title would insure a first lien to John Hanson despite whatever transaction had produced both the recorded financing statement and the covenant not to encumber, made with respect to the Property in favor of the Zubkus Group, and reported to John Hanson in the binder received on April 16.

Binder No. 290291 was obtained by general counsel for John Hanson, for use in preparing a note and deed of trust

---

**3.** One preprinted condition in the binder, precedent to the issuance of the policy specified in the binder, was that "no liens ... intervene between the effective date hereof and the date of said policy...."

for the loan. Green had never seen the binder of April 10 and knew nothing of any arrangements between ARLP and the Zubkus Group. He first learned of the assignment of rents to the Zubkus Group when John Hanson's loan went into default approximately two years later, after the Property had been acquired, apparently subject to, or with an assumption of, the debt to John Hanson, by Practical Investment Corporation. By letter of April 24, 1981, Green transmitted to Clements certain documents for early execution, subject to the satisfaction of open loan conditions.

That same date Michael Hall (Hall), a John Hanson vice president who was responsible for loan commitments, transmitted loan instructions to the firm of Callahan and Clements, as settlement attorneys. Among the documents required were: "Insurance policy in the minimum amount of the loan with John Hanson Savings & Loan, Inc. as the first mortgagee. *LOAN DOES NOT SETTLE WITHOUT INSURANCE POLICY."* *"Additional requirements"* included the following instruction: "You are not authorized to disburse the loan proceeds until you are prepared to issue a final title policy insuring our trust as a first trust with no exceptions." Certain "special instructions" were added by typewriting to the printed form. These included: "Subject to leases being assigned to John Hanson Savings & Loan, Inc. in event of default."

Transfer of the fee interest in the Property from ARLP to Saudi and the loan from John Hanson to Saudi closed April 29 at Callahan and Clements. Documentation which had not been prepared by Green at John Hanson or by Dunn at Stewart Md. was prepared by Kelly. This included a document headed "For Additional Security Assignment of Lessors's Interest in Lease," dated April 29, from Saudi to John Hanson which was signed for Saudi by Clements and by Poole. Ali, who had received a substantial part payment on his interim loan to Saudi, was paid the then overdue balance on that obligation. Stewart Title issued to John Hanson a title policy which conformed to binder No. 290291. There is no evidence that the Zubkus Group was due any

money from the loan closing, and none was disbursed to them.[4]

On October 24, 1988, the Attorney Grievance Commission filed a petition for disciplinary action against Clements which alleged the following:

"29. In connection with the settlement [Clements] executed, as general partner of the Saudi Limited Partnership, an Assignment of Lessor's Interest in Leases to John Hanson Savings and Loan, Inc. with full knowledge that the prior Assignment of Leases, Rents and Profits dated January 29, 1981 remained in effect."

The only finding and conclusion by Judge Nalley of a violation on Clements's part relates to the above allegation. On this point his report to this Court reads:

"I am persuaded clearly and without question that Respondent's April 29, 1981 execution of an assignment on behalf of Saudi Limited Partnership of leases within the 9301 Annapolis Road structure to John Hanson Savings and Loan, Inc. was conduct involving dishonesty, fraud,

---

**4.** In June 1986 the United States Bankruptcy Court for the District of Maryland held that the assignment of rents to the Zubkus Group did not effect an equitable mortgage but only an assignment of income. That did not affect John Hanson's first lien on the realty. The court found,

"as a matter of law that the Assignment ... [did] not constitute the granting of a security interest in the real property.... [T]he court sees the ultimate test as whether the Assignment permits ... foreclosure upon the assignor's [ARLP's] ownership interest in the real estate by selling the property, conveying it to the purchaser in fee simple, and applying the sale proceeds against the assignee....

The Assignment ... when scrutinized for granting a right of foreclosure, clearly stops short of doing so.

. . . .

[T]he assignor intended only that the income from the Property be security for the debt."

In re Practical Investment Corporation, Debtor, Case No. 84–00450A, Ch. XI, U.S.B.C. E.D. Va. (transferred), and consolidated cases (not officially reported), at 10–12 (June 6, 1986).

For the above reasons the Bankruptcy Court concluded that even if John Hanson were on constructive notice of the recorded but unindexed assignment of rents to the Zubkus Group, "it would have been notice only of a prior inferior interest...." *Id.* at 13.

deceit and misrepresentation within the meaning of DR 1–102. This is so because on January 29, 1981 he had executed a similar assignment on behalf of the 9301 Annapolis Road Limited Partnership to Jack and Idalee Diener and Sigitas Zubkus. Execution of the April assignment was a condition of the John Hanson loan commitment while the January assignment had been undertaken as a security interest substituted for the third deed of trust the recording of which had provoked the Baltimore Life foreclosure. It developed that the January instrument was ineffectively recorded, which factor later resulted in the John Hanson interest being accorded priority.[5] Respondent testified that he had been aware of the recording defect and that, rather than being inadvertent, defective recordation had been planned so as to avoid alerting Baltimore Life to the fact of another forbidden encumbrance. He said at the ... hearing [before Judge Nalley] that he had been aware of this defect at the time of his execution of the April assignment to John Hanson, and so had expected the John Hanson assignment to have priority, but the veracity of this assertion is in serious doubt in light of his acknowledged failure to mention such a reason at the Inquiry Committee proceeding and the absence of evidence that the Dieners and Mr. Zubkus were aware that the assignment to them would be defectively recorded or otherwise subordinated to subsequently-recorded encumbrances, including mortgages. A May 8, 1981 memorandum Mr. Clements sent to the January assignees regarding the refinancing and reorganization of the partnership failed to mention such subordination.[6] Put another way, Clements failed to notify the January assignees of what he now says he knew would amount to subordination of their interests and he failed to notify the

---

5. Defective recording was not the basis of the bankruptcy court's decision. *See supra* note 4.

6. This memorandum which was unsigned, but was on the Callahan and Clements letterhead, was never admitted into evidence for lack of authentication.

April assignee of the existence of the January assignment which, had its recordation been orthodox, would have had priority over its mortgage and assignment.[7] The fact that at some juncture in April Stewart Title was prepared to require subordination of the January assignment to the John Hanson lien also provokes doubt as to Respondent's credibility on this issue. Additionally, if Respondent's recent explanation for the failure to record the January assignment is accepted on its face, the January assignment and defective recording were at least misleading as to the Baltimore Life Insurance Company which Mr. Clements hoped to trick into forbearance from foreclosure."

 Judge Nalley plainly rejected Clements's testimony that, at the time of the April assignment to John Hanson, Clements believed that the January assignment to the Zubkus Group could not achieve an enforceable priority over the later instrument. Thus, we eliminate from our analysis that aspect of Clements's defense. A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the dishonesty, fraud, deceit or misrepresentation charged. The issue is whether Bar Counsel presented sufficient evidence of the charge to meet the clear and convincing standard of proof.

 We note first that sanctionable misconduct by an attorney is not limited to the rendering of professional services. *See Attorney Grievance Comm'n v. Shaffer,* 305 Md. 190, 203–04, 502 A.2d 502, 509 (1986); *Attorney Grievance Comm'n v. Silk,* 279 Md. 345, 348, 369 A.2d 70, 71 (1977). It. is necessary, however, in proving a violation of DR 1–102(A)(4) to establish that the dishonesty, fraud, deceit or misrepresentation is intentional. *See Attorney Grievance Comm'n v. Greenspan,* 313 Md. 180, 545 A.2d 12 (1988); *Attorney Grievance Comm'n v. Shaffer, supra.* An example of intentional fraud practiced by an attorney on

---

7. *See supra* note 5.

a mortgage lender is found in *Attorney Grievance Comm'n v. Babbitt,* 300 Md. 637, 479 A.2d 1372 (1984). In order to satisfy a condition of a loan commitment, Babbitt forged a Calvert County use and occupancy permit.

We shall approach the issue in this case from the standpoint of a possible fraud on John Hanson, because that is what we read the charge to have alleged. There is no contention that there was any affirmative misrepresentation. We deal with allegedly intentional fraud by way of concealment. In that context we shall assume, *arguendo,* that Bar Counsel would establish a violation of DR 1–102(A)(4) by proving that Clements knew that the existence of the assignment to the Zubkus Group was so material to John Hanson that, under all of the circumstances, there arose on Clements's part a duty to speak. Alternatively, Bar Counsel could establish the violation by showing that Clements, knowing of the materiality of the January assignment, deliberately manipulated the flow of information to John Hanson to attempt to prevent, even if unsuccessfully, the lender from learning of the prior assignment. The objective facts are consistent with either of the foregoing analyses. Those facts, however, are at least equally consistent with an innocent explanation, namely, that John Hanson was satisfied with a first lien on the Property, insured without exception, and did not require releases from the Zubkus Group to negate any possible impact on John Hanson's security by the transaction between the Zubkus Group and ARLP which had been flagged as a proposed policy exception in the binder.

Within Callahan and Clements, Kelly was the attorney who handled the mechanics of the transaction. He died, apparently without his testimony having been taken, at least in any form or proceeding making it admissible in the instant matter. Dunn, when testifying in 1989, had no recollection of the circumstances surrounding the April 1981 elimination from the binder of the proposed policy exception. A John Hanson vice president, Hall, was called as a witness by Bar Counsel, but his evidence bore on an

aspect of the charges on which there was no finding of a violation. Green, John Hanson's general counsel, maintained his law office in Hyattsville. He testified that John Hanson wanted first call on the rents and that he, personally, was not aware of the assignment to the Zubkus Group at the time of John Hanson's loan to Saudi. Green had not, however, seen or worked with the binder which reflected the Zubkus Group transaction. That had been received by John Hanson at an office in Forestville, identified by Green as the loan closing department, several days before John Hanson communicated its offer of commitment to Saudi. The Mr. Wilbert, who was identified by Green as the person responsible for reviewing the title binder, was not called as a witness. There was no information in the John Hanson file produced at the hearing before Judge Nalley from which Green could tell what brought about the deletion of the proposed exceptions. He acknowledged that John Hanson did not obtain a copy of the release of the Baltimore Life deed of trust, but received only a title policy. At that point the court inquired: "Which means that John Hanson is happy as long as Stewart Title is committed?" Green responded: "Yes. We are relying on the title insurance to protect the title that we have."

It is also clear that Mr. Wilbert, or some other representative of John Hanson who received the original binder, was necessarily alerted to a prior`obligation of some kind, involving the Property, and running from the ARLP partners to the Zubkus Group. The binder reported a financing statement recorded in the land records. Dunn testified, without contradiction, that financing statements are frequently recorded in the land records to perfect an assignment of rents. "How To" books for Maryland lawyers recommend for use in real estate mortgage lending transactions a financing statement form which includes leases and the rents therefrom and which is to be recorded in the land records. *See* The Maryland Institute for Continuing Professional Education of Lawyers, Inc., C.T. Albert, et al., *Fundamentals of Real Estate Practice*, at 91–92 (1988); R.

Reno, Jr. & W. Simmons, Jr., *Maryland Real Estate Forms —Practice,* Form 3.3.16, at 619–20 (1983). The binder also disclosed a covenant against further encumbrances which was an independent instrument and not a covenant in a deed. We are unable further to describe this creature. Neither it nor the financing statement are part of the record in the instant matter. Despite these alerts, John Hanson did not require releases from the Zubkus Group. Rather, the title policy exception relating to the Zubkus Group transaction was eliminated shortly after John Hanson's receipt of the initial binder which disclosed that transaction.

Thus, even if it is legitimate inference and not speculation to conclude that Clements personally controlled every action by Stewart Md. and by Kelly, the record as it stands in this case is consistent with John Hanson's having chosen a "clean" title policy as a satisfactory substitute for releases from the Zubkus Group. That does not establish to the clear and convincing standard of proof fraud practiced by Clements on John Hanson.[8]

The suggestion appears in Judge Nalley's findings, and in his comments and colloquy at the hearing in this case, that the bare fact that Clements executed two assignments of the same rents to two different persons establishes *per se* a violation. These assignments were not outright transfers of the same piece of property with warranties of title by the transferor. The assignments were for security purposes, operative only on default by the borrower. It is not impossible for a junior security interest of that type to have some potential value and to be requested by a lender for whatever it may be worth.[9]

---

**8.** There is not a hint in this record, by proof or allegation, that, by committing to "insure over" the Zubkus Group transaction, Clements, in some way acting through Stewart Md., practiced a fraud on Stewart Title.

**9.** The John Hanson loan documents did not require Saudi or the Saudi partners to warrant and represent that the assignment of rents

Judge Nalley's findings also embody an "either/or" passage in which he concludes that, if the January assignment were ineffective, Clements committed a fraud on the Zubkus Group. The complaint in this matter did not charge fraud on the Zubkus Group. No one from the Zubkus Group testified and the charges were not tried on that theory. The January assignment reflects on its face that it was prepared by the attorneys who represented the Zubkus Group. Clements's testimony that those attorneys handled recording of the January assignment is uncontradicted. A conclusion that Clements defrauded the Zubkus Group by failing to disclose the ineffectiveness of the January assignment as recorded is contrary to the factual finding that Clements did not know, even as late as April, that the January assignment was unindexed. In any event, it is not, under the circumstances presented here, a violation of DR 1–102(A)(4) for Clements not to have advised the clients of other attorneys that the recording undertaken by those attorneys was possibly ineffective.

The third level conclusion that Clements defrauded Baltimore Life was neither charged as a violation nor proved.

The exceptions by Clements are sustained.

PETITION FOR DISCIPLINARY ACTION DISMISSED. COSTS TO BE PAID BY ATTORNEY GRIEVANCE COMMISSION OF MARYLAND.

---

and the financial statement intended to perfect that security interest had first priority. A warranty and representation of that type would have added nothing as a practical matter. The assignments, as drafted, operated only in the event of default by Saudi. If Saudi defaulted, John Hanson already had the personal guarantees of each Saudi partner and their wives, and need not have sued for breach of a warranty or representation in order to obtain unlimited personal liability of all of the partners jointly with their wives.