599 A.2d 100

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Richard Edward KRAMER.

Misc. (Subtitle BV) No. 31, Sept. Term, 1990.

Court of Appeals of Maryland.

Dec. 13, 1991.

40

Melvin Hirshman, Bar Counsel for the Attorney Griev-ance Commission of Maryland, for petitioner.

Benjamin Lipsitz, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Once again we are called upon to discharge an unpleasant obligation and discipline a Maryland attorney. Richard E. Kramer has been a member of the Maryland bar since 1973. Kramer, who is both a businessman and a lawyer, stands accused of violating the following Disciplinary Rules con-tained in the Code of Professional Responsibility [1], which was in effect at the time of the events that now bring him before us:

DR 1–102 Misconduct.

(A) A lawyer shall not:

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(6) Engage in any other conduct that adversely re-flects on his fitness to practice law.

DR 9–102 Preserving Identity of Funds and Property of a Client.

---

[1]. The Code of Professional Responsibility governed the conduct of attorneys in this state until it was replaced on January 1, 1987 by the Maryland Rules of Professional Conduct. *See* Maryland Rule 1230.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

Bar Counsel for the Attorney Grievance Commission also contends that Kramer violated Maryland Code (1957, 1987 Repl.Vol.), Article 10, § 44, which governed the handling of escrow funds by attorneys when the alleged transgressions at issue took place.[2]

## The Facts

Kramer and Howard E. Mirsky were in the mortgage brokering business together. Through their joint enterprises—a corporation named 20–20 Ltd., which also traded as Commerce Credit, and a partnership called 20–20 Partnership—they put individual borrowers and lenders together. As security, a borrower would give a lender, who was also described as an investor, a mortgage interest in real property. Usually Kramer would prepare the deeds of trust, which he would sign as an attorney, and conduct the settlements on the transactions. On occasion Kramer was asked to file foreclosure proceedings for 20–20 Ltd. Under the normal arrangement, Kramer and Mirsky would collect monthly payments from the borrowers—sometimes at an interest rate of 24 percent or higher—and pay the investors. For their services, Kramer and Mirsky would charge the

---

2. The General Assembly repealed Article 10, § 44 in 1989. For current law on Attorney Trust Accounts, see Maryland Code (1989, 1991 Cum.Supp.), Business Occupations and Professions Article, §§ 10–301 through 10–306.

borrowers settlement fees of $300 to $1,000 at the outset and then a $5.00 fee for each loan payment collected.

One of their regular investors was Michael A. Levitt, who decided to get into the lending business after inheriting some money from his father in 1980. Levitt knew Mirsky from his college days at the University of Baltimore in the mid–1960s and had also been acquainted with Kramer, though for a shorter period of time. During the early 1980s, Levitt made more than 25 loans through Kramer and Mirsky. According to Levitt, sometimes Mirsky would telephone him with a potential borrower; sometimes Kramer would make the call. Levitt would be told how much the loan was for, its purpose, and whether he would receive a first, second, or third mortgage on the securing property. Checks would come from either Kramer or Mirsky. Kramer was the only person who would settle on the loans. Levitt said that he was promised that the loans were guaranteed and that he was to get his regular payments from Mirsky and Kramer, even if the borrower had not lived up to his part of the deal; the partners would pursue a delinquent borrower. When a loan was eventually paid off, Levitt was to receive the remainder of his outstanding principal.

Levitt thought everything was going smoothly until he received a telephone call in September of 1983. Something was wrong, he was told; Kramer and Mirsky wanted to meet with him immediately.[3] At a meeting held in his Baltimore County home, Levitt was informed that some of his loans had previously been paid in full, but his money had not been returned to him because Mirsky had used it to speculate in the stock market. Mirsky's talent for picking Wall Street winners had been poor; Levitt's capital was now gone, and the partners could not currently repay the

---

3. Levitt testified that he did not know which of the two men telephoned him. Kramer testified that he initiated the meeting; on every question posed to him at the hearing in this case, except those seeking to verify his name and address, Mirsky exercised his Fifth Amendment right not to incriminate himself.

missing money. According to Levitt, Kramer "looked me right in the eye and said, 'I guarantee you you'll get every penny of your money.'" Kramer denies that he ever made such a promise.

Eventually Levitt learned that several of his loans, totalling well over $100,000, had been paid off without his knowledge and the proceeds squandered. Levitt filed suit in the Circuit Court for Baltimore County, naming as defendants 20–20 Ltd., Mirsky, and Kramer—both individually and trading as Commerce Credit.[4] Mirsky failed to plead to the complaint, and a default judgment was entered against him in the amount of $116,816.68 in compensatory damages and $10,000.00 in punitive damages.

A jury found in Levitt's favor against Kramer and the business. Kramer and 20–20 Ltd.[5] were ordered to pay compensatory damages of $198,539.50 and punitive damages of $162,500.00 plus interest and costs. On appeal, the damage awards were vacated because the trial judge had allowed Kramer's Fifth Amendment pleas to Levitt's requests for admissions to be deemed admissions. *Kramer v. Levitt,* 79 Md.App. 575, 582–87, 558 A.2d 760, 764–766, *cert. denied,* 317 Md. 510, 564 A.2d 1182 (1989). But the Court of Special Appeals found that

"[t]he properly admitted uncontroverted evidence in the instant case established, as a matter of law, that [Kramer] had breached his duty to deliver money to [Levitt] which he had collected as [Levitt's] agent and trustee."

*Id.* 79 Md.App. at 589, 558 A.2d at 768. The appellate court sent the case back to Baltimore County for a new trial

---

4. It is unclear from the record before us exactly how these business enterprises—20–20 Ltd., 20–20 Partnership, and Commerce Credit—relate to one another. In whatever form, however, they were joint endeavors of Mirsky and Kramer and were the vehicles for creating and securing the loans.

5. 20–20 Ltd. did not appear in the case, though it had been served with process.

solely on damages. The case was eventually settled for $60,000.

The above facts are relatively clear and uncomplicated. For our purposes, however, we must dig deeper. This is where we find matters murky. We are troubled by the lack of relevant information in the record, especially when it stems from Kramer's forgetfulness, which he attributed to his being a recovering alcoholic. At his deposition, he could not remember (1) if he was a shareholder in 20–20 Ltd., a company he had formed, (2) whether he was a signatory on a Fairfax Savings bank account in the name of 20–20 Ltd., (3) the nature and purpose of that account, (4) how and when 20–20 Ltd. came to an end, (5) where 20–20 Ltd. kept its business records, (6) from whom he leased his law office, (7) who was regularly on the first floor of the two-story Baltimore County townhouse in which he had his law office, (8) either the names of his secretaries from 1982 to the present or the periods of time they worked for him, (9) whether debtors would pay to 20–20 Ltd. rather than to himself, or (10) whether he ever found money in his escrow account that he couldn't identify as belonging to someone and couldn't explain how it got into his account. Kramer's records for the pertinent period of time are also virtually nonexistent.

Kramer testified that he abandoned his law practice and left the Baltimore area on the last day of November, 1982, apparently as a result of mounting personal problems. He was an alcoholic, and his second marriage was in tatters. Kramer freely admitted at the hearing below that he ran away from his troubles; his attorney told us at oral argument that Kramer "got a bellyful of life" and left the area.

Kramer ended up in Atlanta, where he worked for a while as a bartender. He cut his ties to life in Maryland so completely that his father had to hire a private detective to track him down. Eventually, in June of 1983, Kramer came back to Maryland and, according to his testimony, found that many of his files had vanished and that Mirsky had misappropriated Levitt's money and squandered it on poor

investments. Three months later, Kramer and Mirsky met with Levitt and disclosed the defalcation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Judge Eugene M. Lerner, whom we assigned to hear the case against Kramer pursuant to Maryland Rule BV9, found that, while much of the misappropriation took place after Kramer had left the state, Kramer's "connection with the mortgage brokering business was such that he either knew or should have known of the fraudulent activities that were underfoot."

■ Judge Lerner found that Kramer had violated DR 1–102(A)(4) by engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation with respect to the Levitt loans. The basis for this finding was Judge Lerner's observation that Kramer should have known of Mirsky's misdeeds because of his intimate involvement in their joint businesses. This was the case Judge Lerner found, even though most, if not all, of the misappropriation occurred while Kramer was out of state and out of touch.

The record before us, however, does not provide clear and convincing evidence that Kramer himself was guilty of fraudulent conduct with respect to the Levitt loans. His records, though sloppy and skimpy, do not prove deceit or misappropriation, especially since the evidence is that the person who used Levitt's money for speculation was Mirsky, not Kramer. To be sure, given his participation with Mirsky in the joint business enterprises, Kramer was liable for the money owed to Levitt.[6] In fact, he admitted before Judge Lerner that he was "responsible to a large degree for what happened" because he had failed to supervise what

6. Kramer claims he was no longer involved in the businesses once he fled town. To support this contention, he points to a letter written to him by Mirsky early in November of 1982 in which Mirsky essentially dissolved his involvement in 20–20 Partnership. There is no indication, however, that Kramer's links to 20–20 Ltd. were similarly cut. And his activities resumed at least in some fashion once he returned to Maryland.

had been going on with the books and records. But this liability alone does not mean that Kramer committed acts that bring him in violation of DR 1–102(A)(4). While Kramer's conduct may have been negligent in this respect, there was no clear and convincing evidence to establish that he intentionally deceived or defrauded Levitt. Therefore, we find no violation of DR 1–102(A)(4). *Attorney Griev. Comm'n v. Clements,* 319 Md. 289, 298, 572 A.2d 174, 179 (1990).

 Judge Lerner also found that Levitt was a client of Kramer's. Kramer disputes this and claims that he had a business relationship, not an attorney-client relationship, with Levitt. Kramer contends that he was the attorney only for 20–20 Ltd. "What constitutes an attorney-client relationship is a rather elusive concept." *Folly Farms I, Inc. v. Trustees,* 282 Md. 659, 670, 387 A.2d 248, 254 (1978). The relationship does not require a formal fee, *Central Cab Co. v. Clarke,* 259 Md. 542, 549–50, 270 A.2d 662, 666–67 (1970), but it can be implied from the facts and circumstances of the given case. *See Crest Investment Trust v. Comstock,* 23 Md.App. 280, 296, 327 A.2d 891, 901 (1974).

 Although Kramer's status as an attorney motivated and facilitated the business arrangement between Levitt, Mirsky, and himself, there was no clear and convincing evidence that Kramer was acting as Levitt's attorney in the collection and disbursement of the mortgage loans. We sustain Kramer's exceptions to this finding. But even if there was no formal attorney-client relationship with Levitt in the collection of the loans, Kramer would not be relieved of his ethical obligations.

It is apparent to us after examining the evidence before us that Judge Lerner was not clearly erroneous when he also concluded that Kramer's status as an attorney "was one of the reasons [Levitt] decided to enter into business dealings with [Kramer]." Kramer's position as a lawyer continued to be an important element in the business and in the relationship with Levitt. The record before us shows

Kramer used law office stationery when corresponding on the subject of Levitt loans, while Mirsky used letterhead for 20–20 Ltd. The record before us also reveals that on occasion Kramer used his attorney escrow accounts for the lending business. Several checks from at least two "Richard E. Kramer Attorney-at-Law escrow accounts"—one at Union Trust Company of Maryland and the other at Fairfax Savings Association—show that these accounts were used as part of the loan business even after Kramer returned to Maryland from his self-imposed exile.

The line between being a lawyer and being an entrepreneur is not always sharp. But for disciplinary purposes, the distinction may not be crucial. *See Attorney Griev. Comm'n v. Martin,* 308 Md. 272, 282, 518 A.2d 1050, 1055 (1987); R. Friedman, *"The Creation of the Attorney–Client Relationship: An Emerging View,"* 22 California Western L.R. 209, 225–27 (1986); *Matter of Makowski,* 73 N.J. 265, 374 A.2d 458, 460 (1977) (attorney's duty "to adhere to the high ethical standards exacted of a lawyer" was not lessened even though the advice was "more of a business than of a legal nature"); *Matter of Burton,* 472 A.2d 831, Appendix 836–37 (D.C.App.1984), *cert. denied,* 469 U.S. 1071, 105 S.Ct. 563, 83 L.Ed.2d 504 (disciplinary rules applied "when an attorney abuses his or her fiduciary duty, even where a conventional lawyer-client relationship does not exist.")

We have long made it clear that "sanctionable misconduct by an attorney is not limited to the rendering of professional services." *Clements,* 319 Md. at 298, 572 A.2d at 179. As we said in *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 550, 318 A.2d 811, 815 (1974):

> "The professional ethical obligations of an attorney, as long as he remains a member of the bar, are not affected by a decision to pursue his livelihood by practicing law, entering the business world, becoming a public servant, or embarking upon any other endeavor. If a lawyer elects to become a business man, he brings to his mer-

chantry the professional requirements of honesty, uprightness, and fair dealing."

*See also, Attorney Griev. Comm'n v. Lazerow,* 320 Md. 507, 513, 578 A.2d 779, 782 (1990) (misappropriation by an attorney in nonprofessional capacity warrants severe sanction "since it involves a breach of trust or a fiduciary relationship and bears upon the fitness of a lawyer to practice his profession.")

Kramer claims that many of his records disappeared and that he doesn't know what happened to them. Kramer's records were at least as "woefully deficient" as those discussed in *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 343, 587 A.2d 511, 515 (1991). There, it was difficult for all concerned to find out what had happened to substantial amounts of money, and the respondent tried "to turn that self-generated confusion to his advantage...." *Id.* at 344, 587 A.2d at 515.

In the case now before us, it is clear that Kramer on occasion used his attorney escrow account as a repository for at least some of the money involved in the businesses. On June 3, 1982, Alan Legum, an attorney acting on behalf of a borrower who owed money to Levitt and other lenders, sent a $10,000 check to Kramer made out to Richard E. Kramer, Trustee, representing a partial payoff of several loans. The check was endorsed and deposited in Maryland National Bank. Kramer acknowledged knowing Legum represented one of the borrowers but said he did not remember receiving the check and denied that the signature on the endorsement was his. We note that the letter accompanying the check stated that it was being sent pursuant to a telephone conversation Legum had with Kramer the previous day. Judge Lerner found as a fact that the check was received by Kramer and deposited in Kramer's escrow account at Maryland National Bank.

■ Judge Lerner further found that Kramer violated his "duty to keep track of the funds to make sure they were properly disbursed" under DR 9-102(B)(3) and noted that

Kramer "has produced no record of how these funds were deposited or disbursed and he has no recollection of the receipt or disbursement of the money." Kramer did produce a letter dated June 4, 1982, written by Mirsky purporting to show how the $10,000 was disbursed, but Judge Lerner found that there was "no adequate explanation ... as to how the funds came to be in the possession of Mr. Mirsky and whether or not Mr. Mirsky even had the authority to disburse such funds." Judge Lerner also found that Kramer's rather vague speculation that "he probably drew a check on his escrow account and put it in the 20–20 Partnership account" was not an adequate accounting for the $10,000 he received as "trustee" and deposited in his escrow account. Judge Lerner did point out, however, that there was no clear and convincing evidence that the $10,000 payment included Levitt funds. He noted that Legum's letter accompanying the $10,000 check "never stated that the $10,000 was to be applied specifically to [a Levitt] loan." He further found that "Mr. Levitt would not have directly received the $10,000 nor would he necessarily have been informed that the $10,000 payment had been made." Since this was the only specific evidence received in relation to Kramer's duty under DR 9–102(B)(1) to notify *Levitt* of the receipt of funds due him, we find no clear and convincing evidence to support a conclusion that Kramer violated that disciplinary rule as to Levitt funds.

Kramer admitted that he did not try to obtain copies of his missing bank records in 1984 even after he was notified that the Attorney Grievance Commission was looking into problems with his accounts. A Maryland National Bank official informed Bar Counsel in April, 1990, that those records were currently unavailable; the bank, he said, kept "copies of the account records for a period of five years only, as required by Federal law...." Had Kramer wanted to reassemble the escrow account information, he could have done so when he first learned of the Attorney Grievance Commission investigation, and it is obvious that he should have assembled those records after being contacted

by Bar Counsel. In a letter to the Attorney Grievance Commission on August 21, 1984, Kramer contested allegations concerning the Levitt loans and claimed he had nothing to do with the business while he was out of state, did not collect any of Levitt's money during that period, had "no knowledge of the account where these monies may have been deposited," and "never had any control over his money...." If Kramer had acted then to put his affairs in order and reconstruct his accounts, some of the answers to the questions before us might be clearer. Instead, Kramer flatly admitted that in 1984, after being contacted by Bar Counsel, he made no effort to obtain copies of the missing records.

Kramer's most obvious failing, therefore, can be found in his violations of DR 9–102(B)(3). He abandoned his office, files, and escrow accounts when he fled from his responsibilities. He didn't know the status of his bank accounts and even signed a blank check so that his father could clear out his escrow account. In a memorandum filed in the case, Kramer acknowledges that he authorized his father to "close the [escrow] account and distribute the funds to whoever was entitled to them. However, he has no recollection of any specifics in that regard and no records documenting such distribution."

▮ Not only did Kramer fail to maintain any records or to render any accounting of funds that were in his escrow account, he doesn't know what became of the money. Such conduct, coupled with his cavalier attitude about his missing records, is at least gross negligence and unacceptable for a member of the bar. "Fiduciaries in general, and attorneys in particular, must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds." *Owrutsky*, 322 Md. at 345, 587 A.2d at 516.

Even while he was out of Maryland, there was apparent activity in Kramer's attorney escrow account, an account

for which he was the only signatory. A Maryland National Bank official was able to establish that there was a balance of $10,484.00 for that escrow account as of March, 1983, when Kramer was in Georgia. Less than three months later, according to a statement that was introduced into evidence at Kramer's deposition, the account balance was $5,640.58. Thus, someone was withdrawing thousands of dollars from that escrow account *during the period Kramer was in Georgia,* and Kramer was the only person authorized to do so.

■ Kramer's professed inability to render an accounting of what happened in his law practice and his escrow account coupled with his loss of memory on everything from money entrusted to him to the names of his secretaries casts doubt on his ability to adequately carry out the functions of an attorney. Therefore, we believe Judge Lerner was correct in concluding that Kramer's conduct "adversely reflect[ed] on his fitness to practice law" in violation of DR 1–102(A)(6).

Judge Lerner also found that Kramer violated DR 9–102(B)(4) "when he failed to promptly pay or deliver to Mr. Levitt as requested by him any funds in possession of [Kramer] which Mr. Levitt was entitled to receive." While we strongly suspect that Judge Lerner may have been correct, there was no clear and convincing evidence that any specific payment due Levitt was received by Kramer and not remitted to Levitt, and we sustain Kramer's exceptions to this finding. The $10,000 sent to "Richard E. Kramer, Trustee" by Alan Legum may or may not have included Levitt loan payoffs. Judge Lerner found no fraud was proven with respect to this check. Other moneys due Levitt were misappropriated by and apparently received by Mirsky rather than Kramer. Because there was no specifically identified payment to Kramer of funds due but not paid to Levitt, we find no clear and convincing evidence of a violation of DR 9–102(B)(4).

■ Finally, Judge Lerner was not clearly erroneous in finding that Kramer violated what was then Art. 10, § 44. That statute provided:

"(a)(1) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposit moneys or other trust moneys, of whatever kind or nature, such moneys, in the absence of court order to the contrary shall be expeditiously deposited in an account or accounts maintained as a separate account or accounts for funds belonging to others. In no event shall the attorney commingle any such funds with such attorney's funds or use any such funds for any purpose other than the purpose for which they were entrusted to the attorney."

As Judge Lerner found and as we have detailed above, Kramer "had a duty to safeguard and keep track of the funds. This he did not do. In addition, Mr. Kramer allowed his father to disburse the $5,600 in the escrow account." When Kramer left the area and apparently abandoned his practice as well as his escrow account, we may assume the funds in that escrow account were in fact escrow funds entrusted to Kramer and belonging to other people. Those funds should not have been initially abandoned or ultimately turned over to Kramer's father.

The duty, as is clear from the statute, covered not only accounts for an attorney's clients but other moneys entrusted to the attorney. Kramer's failure to maintain any records regarding his escrow account, his inability to account for those funds, his initial abandonment of the escrow funds, and his ultimate relinquishment of these funds to his father, all support Judge Lerner's finding of the violation of former Art. 10, § 44.

### *The Sanction*

We must next determine the proper sanction for Kramer's behavior. Bar Counsel recommends a two-year suspension from the practice of law. Kramer counters that he should receive a reprimand at most.

As we have noted, Kramer is a recovering alcoholic who had been going through domestic turmoil. When alcohol has contributed substantially to the misconduct, our approach to the wayward attorney is less harsh. *Attorney Griev. Comm'n v. Powers,* 314 Md. 484, 491, 551 A.2d 465, 468–69 (1989); *Attorney Griev. Comm'n v. Aler,* 301 Md. 389, 398, 483 A.2d 56, 61 (1984). Our duty, as always, is to protect the public and show "to members of the legal profession the type of conduct which will not be tolerated." *Attorney Griev. Comm'n v. Hamby,* 322 Md. 606, 611, 589 A.2d 53, 56 (1991). Even assuming that Kramer was ignorant of Mirsky's misuse of Levitt's money, this Court cannot tolerate the kind of inattention and sloppiness that Kramer exhibited particularly with regard to managing his escrow accounts. Furthermore, we cannot ignore the fact that Kramer, for whatever reasons, abandoned his office and his responsibilities without seeing to it that his records were safely maintained.

A substantial suspension is called for. Thus, Kramer will be suspended indefinitely from the practice of law with the right to reapply not less than one year from the date of the filing of this opinion.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING ALL COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST RICHARD EDWARD KRAMER.